# EXHIBIT 8

Electronically FILED by
Superior Court of California,
County of Los Angeles
8/08/2023 11:00 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By R. Pineda, Deputy Clerk

1 | **MICHAEL E. WEINSTEN (SBN 155680)**
**T. WAYNE HARMAN (SBN 254089)**
2 | **LAVELY & SINGER**
**PROFESSIONAL CORPORATION**
3 | 2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
4 | Telephone: (310) 556-3501
Facsimile: (310) 556-3615
5 | Email: mweinsten@lavelysinger.com
        wharman@lavelysinger.com
6 |
7 | Attorneys for Plaintiff
TOMMY ALASTRA PRODUCTIONS, INC.

8 |

9 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10 | **FOR THE COUNTY OF LOS ANGELES**

11 | TOMMY ALASTRA PRODUCTIONS,
INC, a California corporation,
12 |
            Plaintiff,
13 |
      v.
14 |
HUGO MCDONAUGH, an individual;
15 | PERPETUAL ALTRUISM, LTD, a U.K.
limited liability company; and DOES 1-20,
16 | inclusive,
17 |
            Defendants.
18 |
19 |

CASE NO.:  23STCV03278

[Assigned for All Purposes to
Hon. Christopher K. Lui, Dept. 76]

**SUPPLEMENTAL PROOF OF SERVICE OF SUMMONS AND COMPLAINT ON DEFENDANT PERPETUAL ALTRUISM, LTD.**

20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

1
**SUPPLEMENTAL PROOF OF SERVICE OF SUMMONS AND COMPLAINT**

1   Tommy Alastra Productions, Inc., hereby provides supplemental proof of service of the

2   Summons and Complaint (and ancillary documents) in this matter on Defendant Perpetual Altruism,

3   Ltd. ("PA")

4   On March 7, 2023, Plaintiff filed a proof of service of Summons and Complaint (and

5   ancillary documents), attesting to the fact that service on PA (who resides outside of California, in

6   the United Kingdom), had been properly effectuated by Federal Express.

7   Defendant PA subsequently challenged the validity of this method of service. While Plaintiff

8   contends that the Summons and Complaint were validly served via Federal Express, in an

9   abundance of caution, **Plaintiff subsequently effectuated substitute service on Defendant PA in**

10   **a manner that complies with California law, U.K. law, and the Hague Convention**. As set forth

11   in the attached Declarations of T. Wayne Harman (**Exhibit A** hereto) and Marie Hans (**Exhibit B**

12   hereto), personal service was attempted in the U.K. at least three times each at addresses known to

13   be proper addresses for Defendant McDonaugh and/or PA, after which, (i) the Summons and

14   Complaint (and ancillary documents) were personally served on the manager of the office where

15   McDonaugh and PA maintain an office ("Brock House"), (ii) copies of the Summons and Complaint

16   (and ancillary documents) were mailed to PA at McDonaugh's known home address as well as the

17   Brock House Address, and (iii) Plaintiff obtained certificates from the Foreign Processing Section at

18   the Royal Courts of Justice confirming that service has been effectuated pursuant to the Hague

19   Convention.

20   Dated:  August 8, 2023                          LAVELY & SINGER, P.C.
21                                                   MICHAEL E. WEINSTEN
                                                     T. WAYNE HARMAN
22

23                                                   By:  /s/ T. Wayne Harman
                                                          T. WAYNE HARMAN
24                                                   Attorneys for Plaintiff TOMMY ALASTRA
                                                     PRODUCTIONS, INC.
25

26

27

28

**SUPPLEMENTAL PROOF OF SERVICE OF SUMMONS AND COMPLAINT**

# EXHIBIT A

1  **MICHAEL E. WEINSTEIN (SBN 155680)**
   **T. WAYNE HARMAN (SBN 254089)**
2  **LAVELY & SINGER**
   **PROFESSIONAL CORPORATION**
3  2049 Century Park East, Suite 2400
   Los Angeles, California 90067-2906
4  Telephone: (310) 556-3501
   Facsimile: (310) 556-3615
5  Email: mweinsten@lavelysinger.com
          wharman@lavelysinger.com
6
   Attorneys for Plaintiff
7  TOMMY ALASTRA PRODUCTIONS, INC.

8

9              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                  **FOR THE COUNTY OF LOS ANGELES**

11  TOMMY ALASTRA PRODUCTIONS,          CASE NO.:  23STCV03278
    INC, a California corporation,
12                                       [Assigned for All Purposes to
              Plaintiff,                 Hon. Christopher K. Lui, Dept. 76]
13
         v.                              **DECLARATION OF T. WAYNE HARMAN**
14                                       **IN SUPPORT OF SUPPLEMENTAL PROOF**
    HUGO MCDONAUGH, an individual;       **OF SERVICE OF SUMMONS AND**
15  PERPETUAL ALTRUISM, LTD, a U.K.      **COMPLAINT ON DEFENDANT**
    limited liability company; and DOES 1-20,  **PERPETUAL ALTRUISM, LTD.**
16  inclusive,
17            Defendants.
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF T. WAYNE HARMAN

1.       I am an attorney at law duly licensed to practice before all the courts of this state and am a member of the law firm Lavely & Singer Professional Corporation, attorneys for Plaintiff Tommy Alastra Productions, Inc. I am over the age of 18 and I have personal and first-hand knowledge of the matters set forth in this Declaration and, if called and sworn as a witness, I could and would testify competently thereto under oath.

2.       The Complaint in this matter was filed on or around February 14, 2023.

3.       Upon information and belief, based on corporate filings in both the United States and in the United Kingdom, the corporate defendant in this matter, Perpetual Altruism, Ltd. ("PA"), is a U.K. corporation with its principal place of business at Brock House, 19 Langham Street, London, W1W 6BP, United Kingdom ("Brock House").

4.       Upon information and belief, based on corporate filings in both the United States and in the United Kingdom, the individual defendant in this matter, Hugo McDonaugh, is a citizen of the United Kingdom who resides at one of the following two addresses: (i) 2 Ordnance Mews, London, NW8 6PF, United Kingdom ("Ordnance Mews") and/or (ii) 51 De Walden House, Allitsen Road, London, UK, NW87BA ("De Walden").

5.       On or March 3, 2023 and March 6, 2023, I caused the Defendants to be served with the Summons, Complaint, Civil Case Cover Sheet, Notice of Case Assignment, First Amended General Order, and Alternative Dispute Resolution (ADR) Information Package (together, the "Service Documents"). Specifically, I caused my assistant, Lisa Carpenter, to serve both defendants with the Service Documents at both the Brock House and Ordnance Mews addresses via Federal Express.

6.       On or around March 7, 2023, we filed a proof of service in this matter.

7.       On or around March 9, 2023, I also notified Ryan Lapine, Esq., of Venable, LLP, that service had been effectuated on the Defendants. I knew Mr. Lapine to be legal counsel to the defendants in this matter, as I had engaged in pre-litigation correspondence with Mr. Lapine regarding this dispute.

8.      Subsequently, I received notice that Defendants were objecting to service by Federal Express via correspondence from Mr. Lapine and a Motion to Quash service filed by Mr. Lapine on behalf of Defendants.

9.      While we contend that service was properly effectuated via Federal Express, in an abundance of caution, Plaintiff Tommy Alastra Productions, Inc., retained a U.K. law firm (Solicitor Marie Hans at the law firm of WP Tweed & Co.) to also serve Defendants in accordance with California law, U.K. law, and the Hague Convention, either by personal or substitute service, in addition to service by Federal Express.

10.     As set forth in the concurrently-filed Declaration of Marie Hans ("Hans Decl."), Ms. Hans testifies under oath in her Declaration of the steps she took to serve both Defendants in this matter by personal and substitute service. She testifies, for example, that she retained a U.K. process server to attempt personal (and then substitute) service of the Service Documents on both McDonaugh and PA at the Ordnance Mews, Brock House, and De Walden House addresses (all three together, the "Service Addresses"). The U.K. Process Server working under the control and direction of Ms. Hans, Anthony Booth, also provided a signed declaration (the "Booth Decl.") regarding his efforts to serve the Defendants, which is attached as Exhibit B to the Hans Decl.

11.     According to the Hans and Booth Declarations, at least three attempts were made to personally serve Defendants at each of the Service Addresses. These attempts were unsuccessful.

12.     Following the multiple attempts to personally serve both Defendants at each of the Service Addresses, and as set forth in the concurrently-filed Hans and Booth Declarations, Ms. Hans effectuated substitute service of the Service Documents.

13.     Specifically, a copy of the Service Documents for both PA and McDonaugh was left at Brock House with a person in charge of the Brock House office at the time (no PA employee was present at the Brock House location at any of the multiple service attempts) who confirmed she was over the age of 18, that Mr. McDonaugh and Perpetual Altruism were "virtual clients," that any mail received at Brock House is forwarded to Defendants, and that she would transmit the Service Documents to Defendants. Thereafter, Ms. Hans mailed a copy of the Service Documents to McDonaugh and PA at the Brock House and De Walden Service Addresses (for PA, they were

1    addressed care of PA's CEO, McDonaugh), and confirmed the packages had been successfully

2    delivered.

3        14.    As set forth in Ms. Hans' Declaration, Ms. Hans (a U.K. solicitor) confirmed that

4    service on McDonaugh and PA was effectuated pursuant to U.K. law and the Hague Convention.

5    Further, we have received certificates from the Foreign Processing Section at the Royal Courts of

6    Justice confirming that service has been effectuated pursuant to the Hague Convention.

7

8    I declare under penalty of perjury under the laws of the State of California that the foregoing is true

9    and correct. Executed this 8th day of August, 2023, at Los Angeles, California.

10

11                                                    _____

12                                                    T. WAYNE HARMAN

**HARMAN DECL. ISO SUPPLEMENTAL PROOF OF SERVICE OF SUMMONS AND COMPLAINT**

# EXHIBIT B

1  **MICHAEL E. WEINSTEN (SBN 155680)**
   **T. WAYNE HARMAN (SBN 254089)**
2  **LAVELY & SINGER**
   **PROFESSIONAL CORPORATION**
3  2049 Century Park East, Suite 2400
   Los Angeles, California 90067-2906
4  Telephone: (310) 556-3501
   Facsimile: (310) 556-3615
5  Email: mweinsten@lavelysinger.com
              wharman@lavelysinger.com
6
   Attorneys for Plaintiff
7  TOMMY ALASTRA PRODUCTIONS, INC.

8

9              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                  **FOR THE COUNTY OF LOS ANGELES**

11 TOMMY ALASTRA PRODUCTIONS,            CASE NO.:  23STCV03278
   INC, a California corporation,
12                                       [Assigned for All Purposes to
                Plaintiff,               Hon. Christopher K. Lui, Dept. 76]
13
        v.                              **DECLARATION OF MARIE HANS**
14
15 HUGO MCDONAUGH, an individual;
   PERPETUAL ALTRUISM, LTD, a U.K.
16 limited liability company; and DOES 1-20,
   inclusive,
17
                Defendants.
18
19
20
21
22
23
24
25
26
27
28

**DECLARATION OF MARIE HANS**

I, **MARIE HANS**, Solicitor of 21 Arlington Street, London, England, SW1A 1RN, say as follows:

1.  I am a solicitor of the Supreme Court and England and Wales and a senior solicitor in the firm of WP Tweed & Co, the law firm instructed as agent of Lavely Singer, Attorneys at Law, who are instructed on behalf of the Plaintiff in this matter. I am over the age of 18 years old and not a party to this action.

2.  I make this statement from facts within my own personal and first-hand knowledge, save where otherwise appears and where so appearing I believe the same to be true and accurate in every respect. If called and sworn as a witness, I could and would testify competently thereto under oath.

3.  On 28 March 2023 my firm received instructions from Lavely & Singer Attorneys, in relation to service of Proceedings related to the above-named action. Our instructions were to effect service in line with the Hague Convention namely, the Convention on the Service Abroad of Judicial and Extra Judicial Documents in Civil or Commercial Matters and accordingly in line with the Rules on service in England & Wales.

4.  Lavely & Singer Attorneys provided us with the following documents via electronic mail: (i) Complaint, (ii) Summons, (iii) Filed Civil Cover Sheet, (iv) ADR Information Package, (v) First Amended General Order, (vi) Notice of Case Assignment, and (vii) Notice of Case Management Conference. True and correct copies of these documents are attached hereto as Composite **Exhibit A**.

5.  On 29 March 2023 I instructed Andrew Mawhinney of investigation company, Minerva, to conduct the relevant investigations in respect of two addresses we had been provided for the defendants. Addresses were provided from Lavely & Singer Attorneys for Perpetual Altruism Limited, with a registered office address at Brock House, 19 Langham Street, London W1W 6BP, United Kingdom, and Hugo McDonaugh with a known address at 2 Ordnance Mews, London NW8 6PF, United Kingdom.

6.  On 04 April 2023, Mr Andrew Mawhinney confirmed via electronic mail that investigations had concluded and he believed Mr Hugo McDonaugh was a resident at 2 Ordnance Mews, London, W1W 6BP.

1      7.     On the basis of the above information, 06 April 2023 I submitted two separate service

2 request forms, together with two complete sets of the papers attached as Exhibit A for service, to the

3 Foreign Processing Section, Royal Courts of Justice, London, the Central Authority in the UK for

4 service of foreign documents.

5      8.     On 13 April 2023 the Foreign Process Section returned to our office, the papers for

6 service together with two registered references for service namely, KF- 2023-001456, relating to

7 service upon Hugo McDonaugh, in his personal capacity and KF-2023-000144 for Perpetual Altruism

8 Ltd.

9      9.     Both service request forms were completed for service at 2 Ordnance Mews, London.

10 Perpetual Altruism Ltd was to be served at this address via personal service upon Hugo McDoanugh

11 in his capacity as a person holding a senior position within the company, which is permissible under

12 our Civil Procedure Rule 6.5.

13      10.    On 26 April 2023 I prepared two packs for service upon Mr. McDonaugh and Perpetual

14 Altruism Ltd. that included the documents attached as Exhibit A, a cover letter, and a Warning and

15 Summary consistent with the Hague Convention guidance. These service packs were hand collected

16 from me by Andrew Mawhinney of Miverva, for personal service upon the defendants.

17      11.    On the dates of 2 May 2023, 03 May 2023, 4 May 2023, 5 May 2023, 6 May 2023

18 surveillance was conducted at the address of 2 Ordnance Mews, London, London, WIW 6BP and

19 numerous attempts to serve the papers were made by the team instructed by us. Additional attempts

20 to serve at 2 Ordnance Mews, London, were made on 18 May 2023 and 19 May 2023.

21      12.    On 19 May 2023, Andrew Mawhinney confirmed to me that a member of his team had

22 attended Brock House, Langham Street, London, WIW 7NY, to conduct checks on the office address

23 that was registered to Perpetual Altruism Ltd. In Andrew's message he stated that a Megan Hawkins

24 confirmed that the office address is used by Perpetual Altruism Ltd and that she was authorised to

25 accept service of proceedings. I understand from Andrew Mawhinney that a member of his team left

26 a copy of the papers including the cover letter for the 2 Ordnance Mews, London, WIW 6BP address

27 at Brock House, Langham Street, London, WIW 7NY.

28

13.     On 5 June 2023, I engaged the services of Mr. Anthony Booth of Green Process Serving. I provided Anthony with a copy of the documents attached as Exhibit A, together with updated cover letters and the relevant Warning and Summary forms, in line with the Hague Convention guidance.

14.     I instructed Mr. Booth to make three attempts on service at 2 Ordnance Mews, London, in respect of both defendants. Attached as **Exhibit B** is a true and correct copy of the Affidavit of Anthony Booth, which he provided to me.

15.     Under my instructions, Mr. Booth attended 2 Ordnance Mews, London, W1W 6BP on 07 June 2023, 09 June 2023, and 12 June 2023 and made unsuccessful attempts to personally serve both Hugo McDonaugh and Perpetual Altruism Ltd.

16.     On 09 June 2023, I had received updated instructions from Lavely & Singer Attorneys, that they had just been made aware of an address for Hugo McDonaugh from a filing at the Securities and Exchange Commission, which was provided to me and which is attached hereto as **Exhibit C**.

17.     In this filing, the address for Perpetual Altruism Ltd. was still Brock House, 19 Langham Street, London, and the address for Mr. Hugo McDonaugh was now identified as 51 De Walden House, Allitsen Road London, UK NW87BA. The filing was dated 20 January 2023. Based on all our attempts at 2 Ordnance Mews, London, W1W 6BP, I believed this sufficient information to determine this to be Mr. McDonough's last known home address.

18.     On 13 June 2023 I sent Anthony Booth two updated service packs to include the documents attached as Exhibit A, a cover letter and the requisite Warning and Summary in line with the Hague Convention guidance. I instructed Anthony to make three attempts at service on both Mr. Hugo McDonaugh and Perpetual Altruism Ltd at 51 De Walden House, Allitsen Road, London, UK NW87 7BA.

19.     The steps Mr. Booth took to effectuate service at 51 De Walden House, Allisten Road, London, are detailed in his attached declaration.

20.     On 21 June 2023, following the unsuccessful attempts to personally serve Mr. Hugo McDonaugh and Perpetual Altruism at 51 De Walden House, London, I sent two updated service packs to Anthony Booth, to include all of the documents attached as Exhibit A, a cover letter, and an

updated Warning and Summary in line with the Hague Convention guidance, relating to service at Brock House, Langham Street, London, W1W 7NY.

21.    Prior to doing so I confirmed the office registered address for Perpetual Altruism Ltd. with Companies House UK, to be Brock House, Langham Street, London, W1W 7NY. Attached hereto as **Exhibit D** is the filing with Companies House UK demonstrating the registered office address of Perpetual Altrusim Ltd. to be Brock House. Attached hereto as **Exhibit E** is list of directors wherein Mr. Hugo McDonaugh can be found and his correspondence address is recorded as Brock House, Langham Street, London, W1W 7NY.

22.    I refer to Exhibit B regarding all actions taking by Anthony Booth in accordance with service of Proceedings upon Mr. Hugo McDonaugh personally and Perpetual Altruism Ltd.

23.    On 26 June 2023 I sent by registered first class post copies of all Proceedings in this matter (attached hereto as Exhibit A), the cover letter and the updated Warning and Summary in line with the Hague Convention guidance to Perpetual Altruism at Brock House, Langham Street, London, W1W 7NY addressed to the CEO.

24.    On 26 June 2023 I sent by registered first class post copies of all Proceedings in this matter (attached hereto as Exhibit A), the cover letter and the updated Warning and Summary in line with the Hague Convention guidance to Hugo McDonaugh care of Perpetual at Brock House, Langham Street, London, W1W 7NY.

25.    On 26 June 2023 I sent by registered first class post copies of all Proceedings in this matter (attached hereto as Exhibit A), the cover letter and the updated Warning and Summary in line with the Hague Convention guidance to Mr Hugo McDonaugh personally at 51 De Walden House, Allitsen Road London, UK NW87BA.

26.    On 26 June 2023 I sent by registered first class post copies of all Proceedings in this matter (attached hereto as Exhibit A), the cover letter and the updated Warning and Summary in line with the Hague Convention guidance to Perpetual Altruism, care of, Mr Hugo McDonaugh at DeWalden at 51 De Walden House, Allitsen Road London, UK NW87BA.

27.    On 28 June 2023 I confirmed with Royal Mail via their online tracking system that all packages referred to in paragraphs 23-26 had successfully been delivered.

28.     On 06 July 2023, I wrote to the Foreign Processing Section at the Royal Courts of Justice confirming that service had been perfected upon Mr. Hugo McDonaugh and Perpetual Altruism Ltd under references KF- 2023-001456 and KF-2023-000144, in line with our Civil Procedure Rule 6. I completed the requisite Certificates to be put before the Master of the High Court of England & Wales for Certification of service in accordance with the Law of England & Wales. I filed updated request forms and Certificates for service upon;

(a) Perpetual Altruism Ltd at Brock House, Langham Street, London, WIW 7NY addressed to the CEO;

(b) Hugo McDonaugh care of Perpetual Altruism Ltd at Brock House, Langham Street, London, WIW 7NY;

(c) Mr Hugo McDonaugh personally at 51 De Walden House, Allitsen Road London, UK NW87BA; and

(d) Perpetual Altruism Ltd, care of Mr Hugo McDonaugh at DeWalden at 51 De Walden House, Allitsen Road London, UK NW87BA.

29.     On 18 July 2023 I contacted the Foreign Processing Section at the Royal Courts of Justice seeking an update on the matter and was advised that the papers had just been received by the relevant Court Clerk. Said Court Clerk, Abdul Mumin requested that I resubmit the Certificates in this matter due to an error on the page. I resubmitted four completed Certificates to reflect service on Mr. McDonaugh and Perpetual Altruism at the addresses set forth in the prior paragraph.

30.     On 03 August 2023 I received sealed certificates from the Court relating to service upon Hugo McDonaugh and Perpetual Altruism Ltd at Brock House, 19 Langham, Street, London, WIW 7NY, attached hereto as **Exhibit F.**

31.     On 04 August I received sealed certificates from the Court relating to service upon Hugo McDonaugh and Perpetual Altruism Ltd at 51 De Walden House, Allitsen Road London, UK NW87BA, attached hereto as **Exhibit G**

32.     I can confirm that service in this matter has been conducted in accordance with the Laws of England and Wales, most particularly in accordance Common Law, Civil Procedure Rule 6 and Section 1140 of the Companies Act 2006.

33.     I can further confirm that service in this matter has been conducted in accordance with the Hague Convention namely, the Convention on the Service Abroad of Judicial and Extra Judicial Documents in Civil or Commercial Matters.

34.     I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 7th day of August at Belfast, United Kingdom.

Signed: _____

Position: Senior Solicitor, WP Tweed & Co Solicitors

Dated: 7th August 2023

DECLARATION OF MARIE HANS

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| TOMMY ALASTRA PRODUCTIONS, INC, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>HUGO MCDONAUGH, an individual; PERPETUAL ALTRUISM, LTD, a U.K. limited liability company; and DOES 1-20, inclusive,<br><br>Defendants. | CASE NO.: 23STCV03278<br><br>[Assigned for All Purposes to Hon. Christopher K. Lui, Dept. 76]<br><br>**DECLARATION OF MARIE HANS** |

**EXHIBIT A**

Electronically FILED by Superior Court of California, County of Los Angeles on 02/14/2023 02:51 PM David W. Slayton, Executive Officer/Clerk of Court, by Y. Tarasyuk,Deputy Clerk

23STCV03278

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Christopher Lui

1 | **MICHAEL E. WEINSTEN (SBN 155680)**
**T. WAYNE HARMAN (SBN 254089)**
2 | **LAVELY & SINGER**
**PROFESSIONAL CORPORATION**
3 | 2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
4 | Telephone: (310) 556-3501
Facsimile: (310) 556-3615
5 | Email: mweinsten@lavelysinger.com
          wharman@lavelysinger.com
6 |
Attorneys for Plaintiff
7 | TOMMY ALASTRA PRODUCTIONS, INC.

8 |                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 |                          **FOR THE COUNTY OF LOS ANGELES**

10 |

11 |
TOMMY ALASTRA PRODUCTIONS,      CASE NO.: 23STCV03278
12 | INC, a California corporation,
                                **COMPLAINT FOR:**
13 |              Plaintiff,
                                **(1) BREACH OF CONTRACT;**
14 |     v.                      **(2) PROMISSORY ESTOPPEL;**
                                **(3) FRAUD;**
15 | HUGO MCDONAUGH, an individual;   **(4) ACCOUNTING; and**
PERPETUAL ALTRUISM, LTD, a U.K.  **(5) DECLARATORY RELIEF**
16 | limited liability company; and DOES 1-20,
inclusive,
17 |
                                **DEMAND FOR JURY TRIAL**
18 |              Defendants.

19 |

20 |

21 |

22 |            Plaintiff TOMMY ALASTRA PRODUCTIONS, INC. ("TAP" or "Plaintiff") hereby alleges

23 | as follows:

24 |

25 |

26 |

27 |

28 |

7307-2

**SUMMARY OF THE ACTION**

1.     This case presents the classic story of a nascent startup (here, Defendant and U.K. company Perpetual Altruism, LTD) that exploits the services of an invaluable, veteran strategic partner (here, Plaintiff and California company Tommy Alastra Productions) in order to achieve fast growth, contracts with that partner to give them a share of the startup's revenue as consideration for the partner's services, and then, when the partner exceeds expectations and the startup has achieved success, refuses to honor the agreement and pretends as though the partner was not crucial to its success. Why? For no reason other than simple greed. Through this lawsuit, TAP seeks what it is owed under the parties' written agreement and what was otherwise promised to TAP, as well as damages for the harm (including, without limitation, significant reputational harm) suffered by TAP as the direct result of Defendants' shameless and malicious campaign of wrongful acts.

2.     Plaintiff Tommy Alastra Productions, Inc. ("TAP") is a production and entertainment marketing company responsible for creating, developing, and delivering award winning content, campaigns, and experiences and building brands and brand awareness in the film, TV, fashion, beauty, luxury goods, and technology industries. TAP is owned and operated by Tommy Alastra ("Alastra"), who, because of his entertainment and business expertise and robust personal connections and contacts across a wide variety of industries, has been a go-to producer and consultant for companies such as Lionsgate, MTV, Showtime Networks, BBC, Jay-Z, bing.com, Gibson Brands, Reebok, Victoria's Secret, Jaguar, and the William Clinton Foundation. Alastra prides himself on being on the cutting edge of Hollywood, Wall Street & Silicon Valley, and as a result, effectively serves as a bridge across these interconnected sectors. In addition to acting as a content producer, TAP has assisted companies with business organization and formation, licensing, protection of intellectual property, product development, branding, operations, finding the right third party vendors, market analysis, artist booking, celebrity endorsements, casting, live performances, influencer engagement, social media campaigns, and media relations, specialty events and public relations.

3.     Defendant Perpetual Altruism, Ltd. ("PA"), is a for-profit UK technology startup (led by CEO and Defendant Hugo Mcdonaugh ("MCDONAUGH")) who is engaged in the business of

facilitating the creation and sale of NFTs, or "non-fungible tokens." NFTs are digital assets that have unique identification codes and metadata and which are designed to "tokenize" real world assets in a way that makes buying and selling them more efficient. Unlike cryptocurrencies, which are designed to be traded at equivalency, each NFT is unique and generates its own value through the market. For example, artists have created their own unique NFT artwork that can be purchased and sold, and while others may be able to view that digital artwork online, the actual ownership of same is transferred through the purchase of the NFT for a negotiated (or auctioned) price. PA uses a proprietary auction system known as "GBM."

4.    PA's initial flagship product was Cryptograph, an online platform where people can experience, collect, and trade NFTs made by world-renowned artists and celebrities, where a portion of each transaction supports a charitable cause selected by the creator. The success of Cryptograph is *necessarily dependent on PA's ability to partner with celebrities, artists, and other icons* to ensure that there is sufficient content on the site to attract NFT purchasers. It also is dependent on having the necessary financing, which in PA's case, depended on a successful Series A.

5.    If you are looking to raise funding for a startup venture in the tech industry, it is essential to have connections to some of the biggest names in Silicon Valley. And if you're looking to sell a product that is made and promoted by celebrities, it is necessary to have connections in the entertainment industry. PA knew this, and to its credit, partnered with someone who had deep connections in both sectors: Alastra (through TAP). In fact, MCDONAUGH referred to Alastra as "a startup's wet dream."

6.    In recognition of the unique value that TAP could provide given Alastra's broad knowledge base and deep connections in key industries, PA and MCDONAUGH made a number of commitments and promises to TAP, both in valid, enforceable written agreements and in the course of their working relationship. These promises were designed to incentivize Alastra to tap into his connections in Hollywood and Silicon Valley in order to supply PA with the content, support, and financing necessary for PA to launch and grow its principal products: Cryptograph, GBM, and myNFT.

7. TAP, relying on PA's contractual and extra-contractual promises, put its reputation on the line and recruited Alastra's top contacts in entertainment and technology that provided PA with the support it needed to achieve fast, sustainable growth.

8. Unfortunately, as soon as TAP helped PA secure millions of dollars in Series A financing (which is the first significant round of financing for any start-up), PA decided that it no longer needed TAP, as it broke its many promises and contractual obligations to TAP about its role going forward (both in the continued development of the three key products and at the company as a whole), refused to pay TAP amounts it indisputably is owed under their enforceable written agreement, refused to indemnify TAP for the costs it incurred in securing key third party vendors for future promised work, refused to recognize TAP's contributions to PA in public statements, ignored TAP's multiple efforts to enforce the terms of the parties' written agreement, removed TAP's access to key company websites and social media accounts in the dead of night and without warning, and caused TAP to incur significant legal fees just to secure that to which it indisputably is entitled.

9. PA breached its contract with TAP, made additional promises to TAP that it justifiably relied on (to TAP's detriment), and, through MCDONAUGH, made material misrepresentations of fact that TAP relied on (also to its detriment). PA has been unjustly enriched and caused TAP millions of dollars in damages, in an amount to be determined at trial. Further, TAP seeks injunctive relief to prevent PA's board from taking any further action unless and until Alastra is appointed to the board, as is required by the terms of the parties' written agreement, and to invalidate all past actions of the board that have been taken after Alastra was unlawfully refused his board seat.

## THE PARTIES

10. Plaintiff TAP is, and at all times relevant hereto has been, a California corporation with its principal place of business located in Los Angeles, California.

11. Plaintiff is informed and believes, and on that basis alleges, that Defendant PA is a U.K. limited liability company with its principal place of business located in London, England.

12. Plaintiff is informed and believes, and on that basis alleges, that Defendant Hugo MCDONAUGH is an individual residing in London, England.

13.  Plaintiff is presently unaware of the true names and capacities of the defendants sued herein as Does 1 through 20, inclusive, and therefore sues said defendants by fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of such fictitiously named defendants when the same have been ascertained.  Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously-named defendants is responsible in some manner for the occurrences, acts and omissions alleged herein and that the damages about which Plaintiff complains were proximately caused by their conduct.  Hereinafter, all defendants (including the Doe Defendants) will sometimes be referred to collectively as "Defendants."

14.  Plaintiff is informed and believes and based thereon alleges that each Defendant at all times mentioned in this Complaint was the agent, employee, partner, joint venture and/or employer of the other Defendants and was at all times herein mentioned acting within the course and scope of that agency, employment, partnership, ownership or joint venture.  Plaintiff is further informed and believes, and thereon alleges, that the acts and conduct of each Defendant was known to, authorized by and/or ratified by the other Defendants, and each of them.

## BACKGROUND FACTS

### The Startup and the Veteran: Perpetual Altruism Needs Help, Contracts with TAP

15.  In 2019, desiring to build up Cryptograph and recognizing the unique value that Alastra (through TAP) could provide given his broad knowledge base and connections in key industries, PA entered into a written production agreement with TAP. Pursuant to that agreement, TAP oversaw the production of cryptographs using Alastra's industry connections to secure artists and celebrities to create cryptographs, as well as the best creative and technical vendors to actually facilitate all aspects of the creation, production, marketing and promotion (including through social media), and distribution of the cryptographs.

16.  The partnership was a great success, and PA sought to fully exploit TAP's treasure trove of contacts and expertise in connection with the growth of Cryptograph and GBM, and the creation of myNFT. myNFT, unlike Cryptograph, is a broader NFT online platform marketplace that uses a proprietary auction technology (GBM) that can be used by the public to create, market and sell their own NFTs. myNFT is on the forefront of NFT auction technology, and has the potential (with

its proprietary GBM auction system) to be a multi-billion dollar business. Its competitor, Opensea, was recently valued at 13.3 *Billion.*

17.     As a result of their success, in April 2020, PA and TAP entered into a written "Equity, Compensation, and Revenue Sharing Agreement" (the "Master Agreement") that, in effect, made TAP a co-founding partner in PA's business, as PA promoted in several PA-approved press releases that were picked up by global press and media outlets. TAP was provided with, among other things, equity in PA, strategic oversight rights (including, without limitation, a seat on PA's board), access to company books and records, and a share of PA's overall revenue and Cryptograph revenue.

18.     The relationship continued to be successful, and TAP continued to grow the Cryptograph business utilizing Alastra's connections and expertise. TAP managed, produced and handled every division and aspect of Cryptograph, growing the brand close to over 1 billion impressions and 13k authentic followers and a business that is valued today at close to $100M.

***The June 2021 Memorandum of Understanding and PA's Promises to Provide TAP With a Budget of at Least $1,500,000***

19.     PA was so pleased with TAP's efforts that it wanted TAP to officially be the lead production company running the entire Cryptograph business, to bring Alastra on as an executive, and to have Alastra play a key role in the development of myNFT and GBM.

20.     While TAP (and Alastra) were willing, able and interested, TAP first demanded that PA make a significant budgetary commitment to the Cryptograph business for two principal reasons. First, TAP previously had been directed by PA (through MCDONAUGH) to make up front payments of retainers to TAP's vendors to secure their availability (they were in high demand), and was now being asked to do the same in 2022 and beyond, and TAP needed assurances that PA would provide the cash needed to pay these retainers. Second, because of the significant investment of time and exploitation of Alastra's connections that TAP would be required to make to do what PA wanted (putting Alastra's valuable reputation on the line), TAP needed assurances that PA was committed to the business, as TAP was relying on the expected production fees and revenue share under the Master Agreement.

21.     PA agreed, and in reliance thereon, TAP entered into a written Memorandum of
Understanding ("MOU") in June 2021. The MOU reflects PA's recognition of Alastra's value and
the fact that he (and TAP) had been undercompensated for their efforts to date. In the MOU, PA
agreed to, *inter alia*, provide TAP with a minimum Cryptograph budget of $500,000 and agreed to
negotiate in good faith on the terms of a guaranteed executive level package for Alastra with regard
to his anticipated work on myNFT. This included, at a minimum and as reflected in the MOU, a base
salary of £90,000 per year (with the expectation that Alastra's total compensation would be at least
$250,000 per year).

22.     In the MOU, PA represented as follows: (i) "**PA is now outsourcing the majority of
Cryptograph production, content sourcing, affiliate management, marketing, and sales to
TAP**;" (ii) "PA is responsible for the costs and expenses of the production of the cryptographs;" (iii)
"Any amount of $ spent to produce the Cryptographs does not get taken off the top and shall be paid
by PA/Cryptographs. This includes production funds, advances, guarantees, charitable donations,
etc.;" (iv) "Cryptographs will outsource to TAP to oversee production, sales, and marketing of
cryptographs, and **provide no less than US$500K budget to TAP** (the "Initial Budget")…;" (v)
"**TAP** agrees to produce for Cryptograph and **shall always be the lead producer for such
cryptographs**. This stipulation comes from the exposure TAP will endure to continue to build and
sustain the Cryptograph brand at a highly discounted amount." MCDONAUGH signed the MOU on
behalf of PA.

23.     Following the execution of the MOU, in or around August 2021, MCDONAUGH, on
behalf of PA, had a Zoom teleconference with Alastra (representing TAP), to discuss PA's plans for
Cryptograph and myNFT. On that call, the parties discussed TAP's needs with regard to growing
Cryptograph (including TAP's need for retainers to secure the team's availability), and TAP's need
for funds from PA (per the MOU), and MCDONAUGH confirmed that the budget would be provided,
saying, "**I'm going to make the money happen**."

24.     On another Zoom call in the summer of 2021 following execution of the MOU,
MCDONAUGH, on behalf of PA, shared a "road map" document on the screen that showed TAP at
the top of Cryptograph (demonstrating that TAP would officially be running Cryptograph) and on

which MCDONAUGH represented that half of the impending Series A funding would be dedicated to the Cryptograph and provided to TAP (at the time, the expected Series A was $3M, but it ultimately closed at $7M).

25.    On yet another teleconference in or around the summer of 2021, MCDONAUGH, on behalf of PA, represented to Alastra (on behalf of TAP) and representatives of two of TAP's vendors, Lisa Jammal and Ali Lasky, that PA would be providing TAP the budget necessary to grow Cryptograph in 2022 and pay its vendors.

26.    MCDONAUGH, on behalf of PA, continued to assure Alastra that TAP would be receiving a minimum budget of $1.5M as late as November 2021, when MCDONAUGH proposed in a written e-mail that a proposed "escrow account for indemnification" for TAP would, according to MCDONAUGH, "**have to be a part of the total $1.5m Cryptograph budget for 2022**."

*TAP Relies on PA's Promises*

27.    It was crucial for TAP to know the size of the budget to be provided by PA, as TAP had to (at MCDONAUGH's direction) enter into contracts with third parties that included both new and continuing retainers to ensure their slates were clear to provide services to PA (through TAP).

28.    This was the way TAP and PA operated for the prior two years: TAP was provided with a set budget which it used to retain third party vendors to produce Cryptographs, including production companies, talent, public relations experts, copywriters, editors, digital animators, professional guild filmmakers, and digital creative experts. In reliance on the budgets provided by PA, TAP retained these third party vendors, often fronting the expense until the budget was received from PA (which, in the past, it always was).

29.    There was never a requirement or expectation that TAP would notify PA of the details of TAP's agreements with these vendors or get pre-approval of any specific costs or expenses (provided that they fell within the contractual budget provided by PA). Past costs and expenses submitted by TAP to PA were paid without having first been pre-approved. TAP routinely over-delivered beyond its contractual minimums.

30.    In reliance on PA's promises made in the discussions leading up to and memorialized in the MOU, TAP and PA entered into another written production agreement on June 1, 2021 (the

1   "2021 Production Agreement"), pursuant to which PA contracted to retain and use TAP's contacts
2   and reputation to aid with the production of Cryptographs. Specifically, PA retained TAP for a six-
3   month term (i.e., through the end of 2021) to provide "comprehensive creative direction, production,
4   and marketing services to aid in the creation, amplification, establishment, and growth of
5   Cryptographs...." Pursuant to the 2021 Production Agreement, PA was to transmit to TAP at least
6   $500,000 for use as a budget in producing cryptographs through the end of 2021, and PA did, in fact,
7   transmit that amount (albeit in piecemeal fashion that forced TAP to cover for PA in the form of intra-
8   company loans) between June and October 2021. This $500,000 budget was separate from, and in
9   addition to, the (minimum) $500,000 to be provided to TAP for Cryptograph production in 2022.

10      31.    In reliance on MCDONAUGH's representations (which were made both to TAP and
11  to TAP's vendors) that (a) PA would be ramping up TAP's Cryptograph business in 2022, (b) TAP
12  would be running Cryptograph for PA, and (c) PA would provide "the proper resources" for
13  Cryptograph, including a minimum budget of $1.5M, and with PA's knowledge, TAP entered into
14  written and oral retainer agreements (new and renewals) with several of its key vendors that were in
15  high demand at a time when this industry was exploding, and made commitments to other vendors
16  that their services would be required in 2022 and to make time in their schedules available for PA via
17  TAP. TAP made total financial commitments to vendors in excess of $300,000.

18      32.    These retainers were necessary because these vendors agreed to accept a lower fee
19  than what they normally charged for their initial work for PA, with the understanding (based on PA's
20  representations) that Cryptograph was going to expand in scope, and they would be provided with a
21  retainer for their normal fee in 2022 and beyond. Further, these vendors were in significant demand
22  and needed reasonable commitments if they were to clear their slates and not work with PA's
23  competitors in the space.

24      33.    Also in reliance on PA's promises, representations, and direct requests, both in and
25  subsequent to the MOU, TAP worked to secure investors for PA. To assist TAP in these efforts, PA
26  included Alastra in its masthead and marketing materials for the series A raise. Alastra was identified
27  as a PA executive; specifically, PA's Chief Strategic Officer.

28

34.   TAP's hard work paid off exponentially for PA, as TAP secured investors who invested a significant amount of money into PA's Series A financing (several of whom sit on PA's advisory board) and secured for PA at a significant discount all requisite internet domains (including Cryptograph.com, myNFT.com and GBMAuction).

*PA and TAP Amend the Master Agreement*

35.   In reliance on PA's and MCDONAUGH's representations that TAP would be the production company of record running PA's Cryptograph business, that TAP would be provided with a minimum budget of $500,000, and that TAP would play a crucial role in the development, launch, and growth of myNFT, the parties also agreed to amend the Master Agreement in December 2021 (the "Amended Master Agreement") to, among other things, reduce TAP's guaranteed profit share of the total Cryptograph business (including TAP's share of Cryptographs that were produced by parties other than TAP). TAP would never have agreed to amend the Master Agreement to reduce its guaranteed profit share if it were not for these representations by PA and MCDONAUGH. The Amended Master Agreement, by its terms, is effective as of March 31, 2021.

*PA Reneges on its Promises and Breaches the Amended Master Agreement*

36.   Despite the fact that the Series A was wildly successful (due in large part to TAP's past success with Cryptograph and PA's use of Alastra's name, likeness, connections, financiers, talent, and advisors), PA utterly failed to provide TAP with any portion of the promised Cryptograph budget, breached the Amended Master Agreement in multiple ways, refused to honor Alastra's contractual right to sit on PA's board, only partially performed a promise to pay Alastra under the MOU, and refused to negotiate Alastra's executive package in good faith.

37.   First, because PA failed to provide TAP with the promised Cryptograph budget (after instructing TAP (and TAP's vendors) to enter into retainer agreements), TAP has been unable to meet its financial commitments to its vendors. Several of these vendors have asserted claims to TAP for the promised retainers, and others have refused to work with TAP in the future as the result of TAP's failure to honor its commitments (which was solely the result of PA's actions). TAP's valuable reputation has been significantly harmed by PA's conduct in this regard.

1       38.   In addition, PA committed multiple uncured, material breaches of the Amended

2  Master Agreement that have caused significant damage to TAP.

3  **_Information and Audit Rights_**

4       39.   Under Sections 3 and 4 of the Amended Master Agreement, TAP is entitled to (among

5  other things)

6           (i)    a perpetual revenue share of all Cryptograph revenue, regardless of whether

7                   TAP has participated in the production of such revenue;

8           (ii)   2% of all PA revenue, from any source, through 2025, and

9           (iii)  25% of all "Other Deal" revenue (as defined in the Amended Master

10                   Agreement) in perpetuity.

11       40.   Specifically, Sections 3 and 4 of the Amended Master Agreement provide, in relevant

12  part, as follows:

13           a.    "TAP shall receive from April 6, 2020 and until May 31, 2021, compensation

14  from the Company Group equal to 2.5% of any and all Cryptograph Revenues received by the

15  Company Group (as defined below); provided, that such percentage shall equal to 0.5% for

16  Cryptographs Revenue related to Existing Cryptographs;" (Section 3)

17           b.    "...continuing in perpetuity, TAP shall receive compensation from the

18  Company Group equal to no less than 50.0% of any and all Cryptograph Revenues received by the

19  Company Group (which shall include, without limitation, any and all Alastra Cryptograph Revenues

20  that is derived by the Company Group as a result of resales or secondary market sales of any

21  Cryptographs) with respect to any Cryptograph originated or produced by any member of the

22  Company Group on or before December 31, 2021 (the "Prior Cryptographs")"; (Section 3)

23           c.    "... continuing in perpetuity, TAP shall receive compensation from the

24  Company Group equal to no less than 50.0% of any and all Alastra Cryptograph Revenues received

25  by the Company Group (which shall include, without limitation, any and all Alastra Cryptograph

26  Revenues that is derived by the Company Group as a result of resales or secondary market sales of

27  any Alastra Cryptographs);" (Section 3)

28

d.      "…continuing in perpetuity, TAP shall receive compensation from the Company Group equal to no less than 10.0% of any and all Company Cryptograph Revenues received by the Company Group (which shall include, without limitation, any and all Company Cryptograph Revenues that is derived by the Company Group as a result of resales or secondary market sales of any Company Cryptographs), and irrespective of that Alastra did not produce such Company Cryptographs;" (Section 3)

e.      "For a five-year period from the date of April 6, 2020, TAP shall also receive compensation equal to 2.0% of any and all Company Revenues. 'Company Revenues' shall mean all revenues actually received by the Company and/or any of its subsidiaries, affiliates, assigns or successors (collectively, the "Company Group") excluding Cryptograph Revenues and Other Deal Revenues;" (Section 3)

f.      "TAP shall receive, from April 6, 2020 and in perpetuity compensation equal to 25% (or any higher or lower percentage as TAP agrees to in writing in good faith in its sole discretion taking the Company's deal business expenses into account) of any and all Other Deal Revenues" (Section 4).

41.    While TAP believes and understands this to be a significant amount of money, it has been left in the dark about the true amount to which TAP is entitled as the result of PA's failure to make the necessary financial reporting to TAP.

42.    Further, pursuant to Section 2 of the Amended Master Agreement, TAP (as a PA shareholder), is entitled to certain anti-dilution protection. Specifically, PA agreed that if "at any time it enters into any agreement or arrangement that grants any shareholder of the Company, any holder of any Company securities, or any other person, (i) anti-dilution protection in respect of any shares in the capital of the Company or other securities of the Company held by them, now or in the future, and/or (ii) the right to acquire additional equity in the Company as a result of anti-dilution like or similar provisions that contains terms and conditions more favorable to such person when such agreement or arrangement is compared to this Agreement, on a "whole agreement" basis (in each case, a "More Favorable Equity Agreement"), *then the Company shall promptly provide notice to TAP of such event* and offer to grant to TAP equivalent anti-dilution protection or terms in respect of

the Ordinary 1 Shares and the Warrants held by TAP and/or Alastra or their respective designees or assigns, retroactive to the date upon which the More Favorable Equity Agreement was effective." (emphasis added).

43.    Pursuant to Section 12 of the Amended Master Agreement, TAP is entitled to receive detailed information about the entire PA business, including the following:

a.    "The Company shall, and shall cause the Company Group to, in perpetuity keep and make available for TAP view- electronic review standard and customary financial and business records of the Company, including, without limitation, accounting ledgers, banking statements, profit and loss statements and other accounting records, and detailed records of all receipts, revenues and disbursements, and other financial activities with respect to the business of the Company Group and the internal affairs and corporate governance (including, without limitation, minutes of all Board and committee meetings thereof) of the Company Group which the Company group maintains in the ordinary course of business (collectively, "Records"), which Records shall at all times at a minimum show truthfully, accurately and fully the compliance by each party with its respective obligations under this Agreement;"

b.    "In addition, on or about the 30th day following the end of each calendar quarter, Company shall furnish to TAP a report of all significant transactions occurring during such prior quarter, including, without limitation all financial Records and summaries of Company's business dealings and transactions;"

c.    "Within a reasonable time after (i) the close of a calendar year and (ii) the expiration or termination of this Agreement, TAP shall have the right, through its designated representatives, at all reasonable times, upon reasonable advance notice, to inspect the Company Group's Records (or electronically if requested by TAP) as necessary to verify the sales, revenues generated and fees collected pursuant to this Agreement, as well as for any other business purposes. dealings and transactions;"

d.    "The Company shall also provide TAP on a quarterly basis with a complete and accurate breakdown of all equity exchanged, sold or purchased, in-kind income, or any investment proceeds secured by TAP Leads, TWG Leads or any of their Affiliate Lead Generators;"

1    e.    "The unaudited accounts of the Company in respect of each accounting period

2 shall be completed and approved by the Board and delivered to TAP within two months after the end

3 of the accounting period to which such unaudited accounts relate;" and

4    f.    "The Company shall provide TAP promptly with such other information

5 concerning the Company and its business as TAP may reasonably require from time to time."

6    Amended Master Agreement at Section 12.

7    44.    Despite numerous demands for this information and these documents (putting aside

8 the fact that TAP should be receiving the majority of this information and these documents without

9 need for a request), PA has failed to provide TAP with any of the requested information, and has

10 failed to propose a system for providing TAP with access to the above information going forward.

11 Only upon receipt and review of this information, can TAP determine whether any additional

12 payments are due from PA to TAP or whether TAP's equity position in PA has been improperly

13 diluted. PA's failure and/or refusal to provide this information and comply with TAP's requests for

14 same constitutes a material breach of the Amended Master Agreement.

15 ***Board Rights***

16    45.    Pursuant to Section 10 of the Amended Master Agreement, "Alastra shall be

17 entitled…to (i) designate (but not an obligation to do so) a director to be appointed to the Board,

18 provided, that such designee (if other than Mr. Alastra…) shall be approved by the Company…."

19    46.    While Alastra notified PA of his exercise of this right, designating himself as a director

20 to be appointed to the Board (which means that PA has no right of approval over his designation per

21 the language of Section 10 quoted above). PA has refused to even consider his designation or

22 recognize his contractual right, which is a material breach of the Amended Master Agreement.

23    47.    These board rights that TAP contracted for are essential to TAP's ability to participate

24 in PA's creative and strategic discussions and share Alastra's input on PA's vision for its short- and

25 long-term future. It is indisputable that TAP helped build PA and achieve its current valuation,

26 bringing talent, investors, and advisory board members (among many other things) to the table. Given

27 TAP's importance, it is paramount for Alastra to be on the Board and to be a part of these discussions.

28

48.    Further, PA agreed in the Amended Master Agreement that "any future issuances, made during the next five years, by the Company of any Equity Securities or any securities convertible into Equity Securities or equity capital of the Company shall be approved by the Company's Board of Directors (the "Board") or a majority of the independent directors of the Company, if any, as a condition of such issuance." As Alastra has been denied his lawful seat on the board, and as TAP has been denied access to the requisite documents and information to which it is contractually entitled, TAP is uncertain as to whether PA securities have been issued unlawfully.

***Non-Circumvention***

49.    Section 8 of the Amended Master Agreement provides, in relevant part, as follows:

"Company or any of the other members of the Company Group or any companies or persons affiliated with or employed by any Company Group member or any of its Representatives (collectively, the Company Entities) shall not circumvent Alastra…, or cause any other person to circumvent Alastra… in any way in connection with this Agreement, the terms hereof or any of their rights hereunder, including, without limitation, as to any of Alastra's…Leads, Investor Leads or any of the other Affiliate Lead Generators, for purposes of soliciting business or financing from, or transacting business with, such contact or any revenue share as provided in this Agreement. The Company agrees that it must obtain the prior written permission (email to suffice) of TAP…, as applicable, before engaging in any discussions with any of Alastra's…Leads or other Affiliate Lead Generators (for the avoidance of doubt save where they are already known to Company as of the date hereof or introduced by persons other than TAP… and/or their affiliates or Leads). The parties acknowledge that breach of this Section 8 shall constitute a material breach of the Agreement."

a.    "Leads," as that term is used in the Amended Master Agreement (including Section 8 thereof) is defined in Section 5 of the Amended Master Agreement as "(1) a business or financing referral that is initiated, directly or indirectly, by Alastra…, (2) the persons set forth on Exhibit A, and (3) the Investor Leads (as defined below), and (4) any other business referrals first introduced to the Company Group, directly or indirectly, through or by such Lead, any affiliates of such Lead or any Affiliate Lead Generator, in each case if the initial Lead introduction was accepted by the Company under the process set out below in this section 5;"

b.    "Affiliate Lead Generator" as that term is used in the Amended Master Agreement (including Section 8 thereof) is defined in Section 5 of the Amended Master Agreement as "a person that has been introduced to the Company Group, directly or indirectly, by Alastra…or through or by any of their Leads, any affiliates of such Leads or any persons introduced, directly or indirectly, by such Lead or affiliates of such Lead, or through or by any Creator introduced by Alastra…, any affiliates of such a Creator or any persons introduced, directly or indirectly, by such a Creator or affiliates of such Creator, in each case if the initial Lead or Creator introduction (as applicable) was accepted by the Company under the process set out below in this section 5;"

c.    "Creator," as that term is used in the Amended Master Agreement, is defined in Section 5 of the Amended Master Agreement as a "person introduced to the Company Group directly or indirectly by… Alastra or through or by any of their Leads, any affiliates of such Leads or any persons introduced, directly or indirectly, by such Lead or affiliates of such Lead, who has created a Cryptograph and provided the Company Group with copies of the Cryptograph for purposes of publishing, distributing and monetizing the Cryptograph (including, without limitation, the persons set forth on Exhibit A);"

d.    "Investor Lead," as that term is used in the Amended Master Agreement (including Section 8 thereof) is defined in Section 5 of the Amended Master Agreement as "any potential investor introduced, directly or indirectly, by (i) Alastra… and/or their Leads or other Affiliate Lead Generators, in each case, if the initial Investor Lead, Lead, Creator or Affiliate Generator Lead (as applicable) was accepted by the Company under the process set out in Sections 5 or 6, (ii) persons set forth on Exhibit A and their affiliates and/or (iii) any other persons introduced, directly or indirectly, by such persons set forth on Exhibit A or their affiliates (if such person(s) was accepted by the Company under the process set out in Sections 5 or 6."

50.    Given the extensive reach of this Section 8, coupled with the significant Leads, Creators, Affiliate Generator Leads, and Investor Leads that TAP brought to PA (directly or indirectly), this non-circumvention provision will result in a large number of deals which PA cannot pursue unless it pays 25% revenue share in perpetuity to TAP, including those involving the accepted

1  advisory board members, their respective sectors in gaming and domains and any introduction/ deal
2  / investment brought forth by them.

3        51.    In fact, because Alastra invested so much of his reputation into the business, and due
4  to the scope of the connections TAP brought to PA via approved investors, cryptograph deals and the
5  many productions (which encompasses almost all of Hollywood), it would be difficult to imagine a
6  deal that PA could make for which it would not owe TAP its contractual revenue share due to this
7  non-circumvention provision. PA instructed Alastra to "make it happen," and there is no doubt that
8  he did just that. The leads that have been accepted by PA either directly or indirectly implicate every
9  major talent agency and the talent they represent, every major manager and management company in
10 sports, media, PR, and production, multiple charitable organizations, countless creative artists and
11 designers, animators and editors, and productions houses and studios from almost every creative firm.
12 Further, Alastra's likeness and other TAP affiliates/ celebrities' likenesses were exploited and used
13 in financial materials which were used to close TAP-introduced investors and advisors.

14       52.    As explained herein, despite numerous demands for information and documents
15 pertaining to these issues (among others) (putting aside the fact that TAP should be receiving this
16 information and these documents without need for a request), PA has failed to provide TAP with any
17 of the requested information, and has failed to propose a system for providing TAP with access to the
18 information going forward. Only upon receipt and review of this information, can TAP determine
19 whether any additional payments are due from PA to TAP. PA's failure and/or refusal to provide this
20 information and comply with TAP's requests for same constitutes a material breach of the Amended
21 Master Agreement.

22 *Approval Rights and Credit*

23       53.    TAP has certain contractual approval and credit rights that have not been recognized
24 by PA. Section 9 of the Amended Master Agreement states as follows:

25       "TAP shall have the right in perpetuity to approve in advance in writing (email to suffice) all
26 correspondence and materials to Alastra's or TAP's Leads (for the avoidance of doubt save where
27 they are already known to Company as of the date hereof or introduced by persons other than TAP,
28 TWG and/or their affiliates or Leads), including, without limitation, any usage of any such Leads'

17
COMPLAINT

name or likeness in connection with the advertising, publicity, display or any other use by or related to the business of the Company Group. Additionally, the Company shall (i) accord TAP the right to (x) be credited on all Company Group business Materials, promotions and advertising related to Alastra or Alastra's Leads and (y) determine in what capacity and how such credit shall appear, acting reasonably, and (ii) obtain TAP's prior written approval (email to suffice) of any advertising, publicity or display which contains any mention or reference to Alastra or Alastra's Leads, such approval not to be unreasonably withheld."

54.    Alastra's name and likeness were used in prior marketing and investment materials which resulted in a successful Series A and millions of dollars in investment to PA. However, in marketing materials for myNFT (including on its website, which would not have been possible without Alastra), Alastra is not even listed as being part of the Executive Team, let alone as Chief Strategic Officer, as was agreed and as was used in PA's financial materials. Further, TAP has not been credited on all Company Group business Materials, promotions, and advertising, as required by this Section 9. TAP is informed and believes, and on that basis alleges, that PA has made an intentional effort to erase any reference to TAP and/or Alastra, as well as their significant contribution to PA's success.

55.    The significant damage that PA's intentional effort to erase TAP and Alastra from the business has caused and will continue to cause to TAP's reputation and credibility cannot be overstated. PA asked TAP to develop the business and used Alastra's likeness and talent to secure funds and advisors only to cause him significant reputational harm and damages. Investors came on board because they appreciate Alastra's work ethic, reputation, and expected involvement in the future of PA and myNFT. PA's actions falsely made it seem as though Alastra is not an equal with the other executives in the business and fail to identify him as the Chief Strategic Officer of myNFT and co-founder of the business as the parties previously agreed, and as was used in PA's financial materials and press releases that were approved by MCDONAUGH (which was used to great success by PA, resulting in closing investments from Alastra leads and other PA investors).

1 | *Attorney's Fees*

2 |     56.    PA has an obligation to fully defend, indemnify, and hold harmless TAP for its

3 | damages (including claims from third parties and TAP's attorney's fees).

4 |     57.    Specifically, pursuant to Paragraph 14 of the Amended Master Agreement:

5 |     a.    "The Company Group and any successor entities, jointly and not severally,

6 | hereby agree to fully indemnify, hold harmless, and defend Alastra and their affiliates and their

7 | respective employees, officers, directors, shareholders, members, attorneys, advisors, agents, and

8 | representatives (collectively, the 'TAP Representatives') from and against any and all liability, loss,

9 | claim, damage, obligation, judgment, cost, or expense (including reasonable attorney's fees and

10 | expenses) (collectively, the 'Damages'), whether arising before or after the Effective Date, incurred

11 | on account of or arising out of…[among other things] (v) any production or sale of any Cryptograph

12 | or any portion thereof, whether such Cryptograph is produced before, on or after the date of this

13 | Agreement, (vi) production of any Cryptograph or any portion thereof by Alastra, or Alastra

14 | providing any services to any member of the Company Group, whether such Cryptograph is produced

15 | or such services are provided before, on, or after the date of this Agreement, or (vii) any business of

16 | any member of the Company Group;"

17 |     b.    "Furthermore, the Company Group and any successor entities, jointly and not

18 | severally, hereby agree to fully indemnify, hold harmless and defend Alastra and other TAP

19 | Representatives from and against any and all Damages arising out of or in connection with any

20 | communications, documents, materials or other information furnished to TAP by any Company

21 | Group member or any of its Representatives for use, communication or dissemination in connection

22 | with this Agreement, and Alastra may rely upon the accuracy thereof without independent

23 | investigation;" and

24 |     c.    "The Company shall also promptly pay or reimburse Alastra and their TAP

25 | Representatives for all of their expenses and costs (including reasonable attorneys' fees) on an

26 | ongoing basis as they are incurred by Alastra and/or their TAP Representatives in defending or

27 | otherwise participating in any Proceeding in advance of its final disposition. "Proceeding" means any

28 | action, claim, complaint, petition, mediation, order, inquiry, request for information, subpoena,

deposition, suit, proceeding, arbitration or investigation, whether civil or criminal, before or by any court or other governmental authority, regulatory body, arbitrator or arbitration panel."

58.    Further, pursuant to Paragraph 15 of the Amended Master Agreement, "[i]n addition, Company shall reimburse TAP for all reasonable preapproved (in writing) travel, entertainment, administrative and other expenses incurred or paid by TAP in connection with the performance of this Agreement, including without limitation, the procurement of revenues, business arrangements, new Creators and their associated Cryptographs (including costs incurred by an Affiliate Lead Generator in performing said tasks), the onboarding of new Affiliate Lead Generators, managing a relationship with a Lead or Affiliate Lead Generator, marketing costs for Company-approved marketing campaigns and other similar business-focused activities."

59.    Finally, Paragraph 13 of the Amended Master Agreement states, in relevant part, that "[i]f any dispute, claim, or cause of action, in law or equity, including but not limited to statutory claims, arising from or relating to the enforcement, breach, performance, or interpretation of this Agreement or the Warrants, is brought against any Party, the prevailing Party shall be entitled to recover reasonable attorney's fees, costs, expenses and disbursements, in addition to any other relief to which the prevailing Party may be entitled."

## FIRST CAUSE OF ACTION

### (For Breach of Contract Against Defendant Perpetual Altruism)

60.    Plaintiff realleges, adopts and incorporates by reference, each and every allegation contained in Paragraphs 1 through 59, inclusive, of this Complaint as if fully set forth herein.

61.    TAP and PA are parties to the written Amended Master Agreement.

62.    In addition to the express provisions of the written Amended Master Agreement, an implied covenant of good faith and fair dealing also existed which precluded Defendant PA from doing anything that would injure TAP's right to receive the benefits of the written Amended Master Agreement.

63.    Defendant PA materially breached the express terms of the written Amended Master Agreement, as well as the implied covenant of good faith and fair dealing, by, *inter alia*, (i) refusing to provide TAP with the information and documents about the business to which TAP is entitled, (ii)

refusing to honor Alastra's right to sit on PA's Board, (iii) refusing to honor TAP's approval and credit rights, (iv) refusing to provide TAP with the information necessary to determine whether PA has breached the non-circumvention provision (which, upon information and belief, given the depth and breadth of TAP's contacts, almost certainly has occurred), and (v) refusing to indemnify TAP for the third party claims and for TAP's attorney's fees.

64. Further, Plaintiff is informed and believes, and on that basis alleges, that PA has not paid Plaintiff all of the funds that are due under the revenue share provisions of the Agreement

65. TAP performed all its obligations under the written Amended Master Agreement, was excused from doing so, and/or was prevented from doing so by PA's bad faith conduct.

66. As a direct and proximate result of the material breach of the written Amended Master Agreement by Defendant PA, TAP has been damaged in an amount that has not yet been fully ascertained but which Plaintiff believes to be in excess of Five Million Dollars. If and when Plaintiff has ascertained the full amount of the damages, it will seek leave of the Court to amend this Complaint accordingly. Further, TAP seeks injunctive relief to prevent PA's board from taking any further action unless and until Alastra is appointed to the board, as is required by the terms of the parties' written agreement, and to invalidate all past actions of the board that have been taken after Alastra was unlawfully refused his board seat.

## SECOND CAUSE OF ACTION

### (For Promissory Estoppel Against Defendant Perpetual Altruism)

67. Plaintiff realleges, adopts and incorporates by reference, each and every allegation contained in Paragraphs 1 through 59, inclusive, of this Complaint as if fully set forth herein.

68. PA clearly and unambiguously promised TAP a Cryptograph budget of at least $500,000 in the MOU, which it increased to at least $1.5M in subsequent correspondence and meetings, coupled with the clear and unambiguous promise that TAP would become the production company of record for PA's Cryptograph business, all with the explicit request that TAP put everything in place necessary to continue production of Cryptograph beginning in 2022.

69. PA should have reasonably expected that these promises would induce TAP to act. In fact, PA knew that they would, given that PA continued to make these promises after TAP informed

1   PA that it was taking action in reliance on those promises, including by making commitments to third

2   party vendors and talent.

3       70.     In light of their working history, past production agreements, partial payments, and

4   the existence of the Master Agreement, TAP reasonably and foreseeably relied on PA's promises and

5   (i) made financial commitments to third parties in order to secure their availability in 2022 (through

6   the use of monetary retainers) and (ii) cleared its own calendar in the expectation of receiving revenue

7   share and other fees from the production of Cryptographs for PA.

8       71.     It would be unjust if PA's promises are not enforced, as TAP will sustain significant

9   damages in the form of amounts owed to third party vendors, reputational damage, and TAP's lost

10  profits from cryptograph production fees and sales, lost revenue share, participation in business

11  development deals, and clearing its calendar for 2022.

12      72.     As a direct and proximate result of Defendant's conduct, TAP has been damaged in

13  an amount that has not yet been fully ascertained but which Plaintiff believes to be in excess of Five

14  Million Dollars. If and when Plaintiff has ascertained the full amount of the damages, it will seek

15  leave of the Court to amend this Complaint accordingly.

16                          **THIRD CAUSE OF ACTION**

17                          **(For Fraud Against All Defendants)**

18      73.     Plaintiff realleges, adopts and incorporates by reference, each and every allegation

19  contained in Paragraphs 1 through 59 of this Complaint as if fully set forth herein.

20      74.     Defendants, including, without limitation, PA and MCDONAUGH, made material

21  representations about the fact that TAP would be running all Cryptograph moving forward and that

22  PA would provide TAP with the resources necessary to do that, including by providing a minimum

23  budget of $500,000 (as set forth in the MOU) that was later increased to $1,500,000 (in

24  teleconferences and written correspondence with MCDONAUGH, acting on behalf of PA).

25      75.     Specifically, in the June 8, 2021 MOU, PA represented as follows: (i) "PA is now

26  outsourcing the majority of Cryptograph production, content sourcing, affiliate management,

27  marketing, and sales to TAP;" (ii) "PA is responsible for the costs and expenses of the production of

28  the cryptographs;" (iii) "Any amount of $ spent to produce the Cryptographs does not get taken off

the top and shall be paid by PA/Cryptographs. This includes production funds, advances, guarantees, charitable donations, etc.;" (iv) "Cryptographs will outsource to TAP to oversee production, sales, and marketing of cryptographs, and provide no less than US$500K budget to TAP (the "Initial Budget")…;" (v) "TAP agrees to produce for Cryptograph and shall always be the lead producer for such cryptographs. This stipulation comes from the exposure TAP will endure to continue to build and sustain the Cryptograph brand at a highly discounted amount." Defendant MCDONAUGH signed the MOU on behalf of PA.

76.    Following the execution of the MOU, in or around August 2021, Defendant MCDONAUGH, on behalf of PA, had a Zoom teleconference with Alastra (representing TAP), to discuss PA's plans for Cryptograph and myNFT. On that call, the parties discussed TAP's needs with regard to growing Cryptograph (including TAP's need for retainers to secure the team's availability), and TAP's need for funds from PA (per the MOU), and MCDONAUGH confirmed that the budget would be provided, saying, "I'm going to make the money happen."

77.    On another Zoom call in the summer of 2021 following execution of the MOU, MCDONAUGH, on behalf of PA, shared a "road map" document on the screen that showed TAP at the top of Cryptograph (demonstrating that TAP would be running Cryptograph) and on which MCDONAUGH represented that half of the impending Series A funding would be dedicated to the Cryptograph and provided to TAP (at the time, the expected Series A was $3M, but it ultimately closed at $7M).

78.    On yet another teleconference in or around the summer of 2021, MCDONAUGH, on behalf of PA, represented to Alastra (on behalf of TAP) and representatives of two of TAP's vendors, Lisa Jammal and Ali Lasky, that PA would be providing TAP the budget necessary to grow Cryptograph in 2022 and pay its vendors.

79.    MCDONAUGH, on behalf of PA, continued to assure Alastra that TAP would be receiving a minimum budget of $1.5M as late as November 2021, when MCDONAUGH proposed in a written e-mail that a proposed "escrow account for indemnification" for TAP would, according to MCDONAUGH, "have to be a part of the total $1.5m Cryptograph budget for 2022.".

80.     These representations were intended to, and did, convey that TAP would be running Cryptograph moving forward and that PA would provide TAP with the resources necessary to do that, including by providing a minimum budget of $500,000 (as set forth in the MOU) that was later increased to $1,500,000 (in teleconferences and written correspondence with MCDONAUGH, acting on behalf of PA).

81.     TAP is informed and believes, and on that basis alleges, that Defendants knew the above representations were false at the time they were made.

82.     TAP is informed and believes, and on that basis alleges, that the representations were made with the intent that TAP rely on the representations, to induce TAP to enter into the Amended Master Agreement with PA and agree to a provision that reduced Cryptograph revenue share (for non-TAP-sourced/produced Cryptograph projects) in the Amended Master Agreement from 50% (which is what TAP was entitled to pursuant to the original Master Agreement) to 10%.

83.     TAP reasonably relied on Defendants' representations. TAP would not have given up this valuable revenue share right or made significant commitments to pay vendors or cleared its schedule for 2022 if it had known that PA and MCDONAUGH's representations were false.

84.     Because PA never intended to continue to have TAP be the primary producer of Cryptograph at the time it made these representations or to provide TAP with the minimum $1.5M budget, TAP is entitled to what the parties had agreed to before TAP was induced to modify its right to this revenue share. Namely, in addition to the other rights granted to TAP in the Amended Master Agreement, as amended, TAP is entitled to 50% (not 10%) of all Cryptograph revenue regardless of whether TAP sourced/produced the underlying Cryptograph projects.

85.     As a direct and proximate result of the fraudulent misrepresentations of material facts by Defendants, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial, but believed to be in excess of $5,000,000.

86.     Plaintiff is informed and believes and based thereon alleges that Defendants, in doing the things herein alleged, acted willfully, maliciously, oppressively and despicably with the full knowledge of the adverse effect of their actions on Plaintiff, and with willful and deliberate disregard of the consequences to Plaintiff such as to constitute oppression, fraud or malice. By reason thereof,

Plaintiff is entitled to recover punitive and exemplary damages from Defendants in an amount appropriate to punish or set an example of Defendants and to deter Defendants from engaging in such conduct in the future.

## FOURTH CAUSE OF ACTION

### (For Accounting Against Defendant Perpetual Altruism)

87.    Plaintiff incorporates by reference Paragraphs 1-86 hereof as though fully set forth herein.

88.    By entering into the Amended Master Agreement, PA knowingly undertook to act on behalf of and for the benefit of TAP with respect to the preparation of accurate participation accounting statements and payment of the appropriate revenue share to TAP.

89.    PA has, at all relevant times, maintained exclusive control over the financial books and records pertaining to the calculation of TAP's revenue share.

90.    PA has refused, and continues to refuse, TAP's requests for access to all relevant financial books and records.  As a result, the balance due from PA to TAP can only be ascertained by an accounting because the information necessary to determine the balance due is within the exclusive knowledge of PA.

## FOURTH CAUSE OF ACTION

### (For Declaratory Judgment Against Defendant Perpetual Altruism)

91.    Plaintiff incorporates by reference Paragraphs 1-86 hereof as though fully set forth herein.

92.    An actual controversy has arisen and now exists with regard to whether TAP has the right, pursuant to the Amended Master Agreement, to appoint Tommy Alastra to PA's Board, whether PA denied TAP that right, whether actions by, and resolutions of, PA's board taken since PA denied that right are void, and whether PA's board has the right to take any further action unless and until Alastra is appointed to PA's board.

93.    TAP requests a declaration that TAP had and has the right, pursuant to the Amended Master Agreement, to appoint Tommy Alastra to PA's Board, that PA denied TAP that right, that the

actions by, and resolutions of, PA's board taken since PA denied that right are void, and that PA's board has no right to take any further action unless and until Alastra is appointed to PA's board.

**PRAYER FOR RELIEF**

WHEREFORE, TAP respectfully prays for judgment against Defendants and each of them as follows:

**AS TO THE FIRST CAUSE OF ACTION:**

1.    For compensatory damages in an amount not less than $5,000,000, in accordance with proof at trial, together with interest thereon at the legal rate;

2.    For an accounting of all gains, profits, and advantage derived from Defendants' unlawful conduct;

3.    For preliminary and permanent injunctive relief ordering Defendants to refrain from taking any board action unless and until Alastra is appointed to PA's Board of Directors;

**AS TO THE SECOND CAUSE OF ACTION:**

4.    For general and special damages in an amount not less than $5,000,000, in accordance with proof at trial, together with interest thereon at the legal rate;

5.    For disgorgement of all monies unjustly received by Defendants and retained at the expense of TAP;

6.    For an accounting of all gains, profits, and advantage derived from Defendants' unlawful conduct;

**AS TO THE THIRD CAUSE OF ACTION:**

7.    For general and special damages in an amount not less than $5,000,000, in accordance with proof at trial, together with interest thereon at the legal rate;

8.    For disgorgement of all monies unjustly received by Defendants and retained at the expense of TAP;

9.    For an accounting of all gains, profits, and advantage derived from Defendants' unlawful conduct;

10.    For punitive and/or exemplary damages as provided by law;

**AS TO THE FOURTH CAUSE OF ACTION:**

11.     For an accounting of all gains, profits, and advantage derived from Defendants' unlawful conduct;

**AS TO THE FIFTH CAUSE OF ACTION:**

12.     For an order finding that that TAP had and has the right, pursuant to the Amended Master Agreement, to appoint Tommy Alastra to PA's Board, that PA denied TAP that right, that the actions by, and resolutions of, PA's board taken since PA denied that right are void, and that PA's board has no right to take any further action unless and until Alastra is appointed to PA's board.

**AS TO ALL CAUSES OF ACTION:**

13.     For all costs of suit;

14.     For attorneys' fees and costs as may be provided by law;

15.     For prejudgment and post-judgment interest at the maximum legal rate, as provided by the laws of the state of California, as applicable;

16.     For such other and further relief as deemed just and proper.


Dated: February 14, 2023

LAVELY & SINGER
PROFESSIONAL CORPORATION
MICHAEL E. WEINSTEN
T. WAYNE HARMAN

By: ___/s/ Michael E. Weinsten___
MICHAEL E. WEINSTEN
Attorneys for Plaintiff
TOMMY ALASTRA PRODUCTIONS, INC.

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2      Please take notice that Plaintiff Tommy Alastra Productions, Inc., demands a trial by jury.

3

4    Dated: February 14, 2023

LAVELY & SINGER
5                                 PROFESSIONAL CORPORATION
MICHAEL E. WEINSTEN
6                                 T. WAYNE HARMAN

7                                 By: ___/s/ Michael E. Weinsten_____
MICHAEL E. WEINSTEN
8                                 Attorneys for Plaintiff
TOMMY ALASTRA PRODUCTIONS, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Electronically FILED by Superior Court of California, County of Los Angeles on 02/14/2023 02:51 PM David W. Slayton, Executive Officer/Clerk of Court, by Y. Tarasyuk,Deputy Clerk
23STCV03278

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

HUGO MCDONAUGH, an individual; PERPETUAL ALTRUISM,
LTD, a U.K. limited liability company; and DOES 1-20, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

TOMMY ALASTRA PRODUCTIONS, INC, a California corporation

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

---

| | CASE NUMBER:<br>*(Número del Caso):* |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>SUPERIOR COURT OF THE STATE OF CALIFORNIA<br>COUNTY OF LOS ANGELES<br>111 North Hill Street, Los Angeles, CA 90012 | 23STCV03278 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

LAVELY & SINGER PROFESSIONAL CORPORATION
2049 Century Park East, Suite 2400, Los Angeles, CA 90067    (310) 556-3501

DATE: David W. Slayton, Executive Officer/Clerk of Court Clerk, by _____, Deputy
*(Fecha)* 02/14/2023    *(Secretario)* Y. Tarasyuk    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*



**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)

☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov<br>Westlaw Doc & Form Builder™ |

Electronically FILED by Superior Court of California, County of Los Angeles on 02/14/2023 02:51 PM David W. Slayton, Executive Officer/Clerk of Court, by Y. Tarasyuk,Deputy Clerk
23STCV03278

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| MICHAEL E. WEINSTEN (SBN 155680) / T. WAYNE HARMAN (SBN 254089) LAVELY & SINGER PROFESSIONAL CORPRATION 2049 Century Park East, Suite 2400, Los Angeles, CA 90067 | |

TELEPHONE NO.:(310) 556-3501          FAX NO.:(310) 556-3615
ATTORNEY FOR *(Name):*Plaintiff TOMMY ALASTRA PRODUCTIONS, INC.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District/Stanley Mosk

CASE NAME: TOMMY ALASTRA PRODUCTIONS, INC. v. HUGO MCDONAUGH, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited  [ ] Limited (Amount (Amount demanded demanded is exceeds $25,000) $25,000 or less) | [ ] Counter  [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | 23STCV03278 |
| | | JUDGE: |
| | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[X] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [X] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [X] punitive
4. Number of causes of action *(specify):* (1) Breach of Contract; (2) Promissory Estoppel; (3) Fraud; (4) Accounting; (5) Declaratory Relief
5. This case [ ] is  [X] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: February 14, 2023

T. Wayne Harman, Esq.
*(TYPE OR PRINT NAME)*

▶ /s/ T. Wayne Harman
*(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)*

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 www.courtinfo.ca.gov Westlaw Doc & Form Builder™ |

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) (*if the
case involves an uninsured
motorist claim subject to
arbitration, check this item
instead of Auto*)
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability (*not asbestos or
toxic/environmental*) (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) (*not civil
harassment*) (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
(*not medical or legal*)
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract (*not unlawful detainer
or wrongful eviction*)
Contract/Warranty Breach–Seller
Plaintiff (*not fraud or negligence*)
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage (*not provisionally
complex*) (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property (*not eminent
domain, landlord/tenant, or
foreclosure*)
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential*)
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
(*arising from provisionally complex
case type listed above*) (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment (*non-
domestic relations*)
Sister State Judgment
Administrative Agency Award
(*not unpaid taxes*)
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified
above*) (42)
Declaratory Relief Only
Injunctive Relief Only (*non-
harassment*)
Mechanics Lien
Other Commercial Complaint
Case (*non-tort/non-complex*)
Other Civil Complaint
(*non-tort/non-complex*)
**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition (*not specified
above*) (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**

| SHORT TITLE. | CASE NUMBER |
|---|---|
| TOMMY ALASTRA PRODUCTIONS, INC. v. HUGO MCDONAUGH, et al. | 23STCV03278 |

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

### Applicable Reasons for Choosing Court Filing Location (Column C)

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.

7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/ Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 1, 11 |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11 |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1, 4, 11 |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1, 4, 11 |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1, 4, 11 |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: | CASE NUMBER |
|---|---|
| TOMMY ALASTRA PRODUCTIONS, INC. v. HUGO MCDONAUGH, et al. | |

| | | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | | Civil Rights (06) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| | | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| | | Fraud (16) | ☐ A6013  Fraud (no contract) | 1, 2, 3 |
| | | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
| | | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1, 2, 3 |
| | | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
| | | | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
| | | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | | Other Contract (37) | ☒ A6009  Contractual Fraud | 1, ②③⑤ |
| | | | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
| | | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation        Number of parcels_____ | 2, 6 |
| | | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| | | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
| | | | ☐ A6032  Quiet Title | 2, 6 |
| | | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | | Unlawful Detainer- Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

| SHORT TITLE: | CASE NUMBER |
|---|---|
| TOMMY ALASTRA PRODUCTIONS, INC. v. HUGO MCDONAUGH, et al. | |

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims<br>from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement<br>of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160  Abstract of Judgment | 2, 6 |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints<br>(Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation<br>Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not<br>Specified Above) (43) | ☐ A6121  Civil Harassment | 2, 3, 9 |
| | | ☐ A6123  Workplace Harassment | 2, 3, 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2, 3, 9 |
| | | ☐ A6190  Election Contest | 2 |
| | | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100  Other Civil Petition | 2, 9 |

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

| SHORT TITLE: | CASE NUMBER |
|---|---|
| TOMMY ALASTRA PRODUCTIONS, INC. v. HUGO MCDONAUGH, et al. | |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON: | ADDRESS: |
|---|---|
| ☐ 1. ☒ 2. ☒ 3. ☐ 4. ☒ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | 3252 Oakshire Drive |

| CITY: | STATE: | ZIP CODE: |
|---|---|---|
| Los Angeles | CA | 90068 |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the Central _____ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: February 14, 2023

/s/ T. Wayne Harman
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev 2/16)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 4 of 4

 **Superior Court of California, County of Los Angeles**

---

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

**What is ADR?**

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

**Advantages of ADR**
- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

**Disadvantages of ADR**
- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

**Main Types of ADR**

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

2019-GEN-014-00

**FILED**
Superior Court of California
County of Los Angeles

MAY 0 3 2019

Sherri R. Carter, Executive Officer/Clerk
By _____, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

IN RE LOS ANGELES SUPERIOR COURT )    FIRST AMENDED GENERAL ORDER
— MANDATORY ELECTRONIC FILING )
FOR CIVIL )
                                )
                                )
                                )

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

  a) **"Bookmark"**  A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

  b) **"Efiling Portal"**  The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

  c) **"Electronic Envelope"**  A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

  d) **"Electronic Filing"**  Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

2019-GEN-014-00

1  e) **"Electronic Filing Service Provider"**  An Electronic Filing Service Provider (EFSP) is a

2      person or entity that receives an electronic filing from a party for retransmission to the Court.

3      In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an

4      agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

5  f) **"Electronic Signature"**  For purposes of these local rules and in conformity with Code of

6      Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision

7      (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule

8      2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or

9      process attached to or logically associated with an electronic record and executed or adopted

10     by a person with the intent to sign the electronic record.

11 g) **"Hyperlink"**  An electronic link providing direct access from one distinctively marked place

12     in a hypertext or hypermedia document to another in the same or different document.

13 h) **"Portable Document Format"**  A digital document format that preserves all fonts,

14     formatting, colors and graphics of the original source document, regardless of the application

15     platform used.

16 2) MANDATORY ELECTRONIC FILING

17 a) Trial Court Records

18     Pursuant to Government Code section 68150, trial court records may be created, maintained,

19     and preserved in electronic format.  Any document that the Court receives electronically must

20     be clerically processed and must satisfy all legal filing requirements in order to be filed as an

21     official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

22 b) Represented Litigants

23     Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to

24     electronically file documents with the Court through an approved EFSP.

25 c) Public Notice

26     The Court has issued a Public Notice with effective dates the Court required parties to

27     electronically file documents through one or more approved EFSPs.  Public Notices containing

28     effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

2

FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

2019-GEN-014-00

1    d) Documents in Related Cases

2        Documents in related cases must be electronically filed in the eFiling portal for that case type if

3        electronic filing has been implemented in that case type, regardless of whether the case has

4        been related to a Civil case.

5  3) EXEMPT LITIGANTS

6    a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt

7        from mandatory electronic filing requirements.

8    b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of

9        Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused

10       from filing documents electronically and be permitted to file documents by conventional

11       means if the party shows undue hardship or significant prejudice.

12  4) EXEMPT FILINGS

13   a) The following documents shall not be filed electronically:

14       i)    Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of

15             Civil Procedure sections 170.6 or 170.3;

16       ii)   Bonds/Undertaking documents;

17       iii)  Trial and Evidentiary Hearing Exhibits

18       iv)   Any ex parte application that is filed concurrently with a new complaint including those

19             that will be handled by a Writs and Receivers department in the Mosk courthouse; and

20       v)    Documents submitted conditionally under seal.  The actual motion or application shall be

21             electronically filed.  A courtesy copy of the electronically filed motion or application to

22             submit documents conditionally under seal must be provided with the documents

23             submitted conditionally under seal.

24   b) Lodgments

25       Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in

26   paper form.  The actual document entitled, "Notice of Lodgment," shall be filed electronically.

27  //

28  //

2019-GEN-014-00

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when** technologically feasible without impairment of the document's image.

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4).  Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked.  Examples include, but are not limited to, the following:

i)  Depositions;

ii)  Declarations;

iii)  Exhibits (including exhibits to declarations);

iv)  Transcripts (including excerpts within transcripts);

v)  Points and Authorities;

vi)  Citations; and

vii)  Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

2019-GEN-014-00

b) Writs and Abstracts

   Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

   If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

   Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

   a) Filed Date

      i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted.    (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

      ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

   a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day before the ex parte hearing.

2019-GEN-014-00

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing.  A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

   a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled.  If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

   b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

      i) Any printed document required pursuant to a Standing or General Order;

      ii) Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

      iii) Pleadings and motions that include points and authorities;

      iv) Demurrers;

      v) Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

      vi) Motions for Summary Judgment/Adjudication; and

      vii) Motions to Compel Further Discovery.

   c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents.  Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

   a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver.  (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

   b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and  California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

2019-GEN-014-00

1  11)  SIGNATURES ON ELECTRONIC FILING

2       For purposes of this General Order, all electronic filings must be in compliance with California

3  Rules of Court, rule 2.257.  This General Order applies to documents filed within the Civil

4  Division of the Los Angeles County Superior Court.

5

6       This First Amended General Order supersedes any previous order related to electronic filing,

7  and is effective immediately, and is to remain in effect until otherwise ordered by the Civil

8  Supervising Judge and/or Presiding Judge.

9

10  DATED: May 3, 2019

11                                      KEVIN C. BRAZILE
                                         Presiding Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES** | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**02/14/2023**<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ Y. Tarasyuk _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br><br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>23STCV03278 |

## THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✓ | Christopher K. Lui | 76 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record    David W. Slayton, Executive Officer / Clerk of Court

on 02/15/2023                                By Y. Tarasyuk _____, Deputy Clerk
　　(Date)

LACIV 190 (Rev 6/18)          **NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**
LASC Approved 05/06

<u>INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES</u>

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

## APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

## PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

## CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

## TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

## COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

## CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

## STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

## FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

## SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

## Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

## *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES** | Reserved for Clerk's File Stamp<br><br>**FILED**<br>Superior Court of California<br>County of Los Angeles<br><br>02/23/2023<br><br>David W. Slayton, Executive Officer / Clerk of Court<br><br>By: _____ S. Sato _____ Deputy |
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | |
| PLAINTIFF:<br>Tommy Alastra Productions, Inc. | |
| DEFENDANT:<br>Hugo McDonaugh, et al. | |
| **NOTICE OF CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>23STCV03278 |

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled at the courthouse address shown above on:

| Date: 06/15/2023 | Time: 8:30 AM | Dept.: 76 |
|---|---|---|

NOTICE TO DEFENDANT:   THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least 15 calendar days prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions, pursuant to LASC Local Rule 3.37, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code section 68608, subdivision (b), and California Rules of Court, rule 2.2 et seq.

Dated: 02/23/2023                                     _Christopher K. Lui / Judge_
                                                                                Judicial Officer

---

**CERTIFICATE OF SERVICE**

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below:

☑ by depositing in the United States mail at the courthouse in Los Angeles _____, California, one copy of the original filed herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid.

☐ by personally giving the party notice upon filing of the complaint.

Michael E. Weinstein
2049 Century Park East
Suite 2400
Los Angeles, CA 90067-2906

David W. Slayton, Executive Officer / Clerk of Court

Dated: 02/23/2023                                     By S. Sato _____
                                                                              Deputy Clerk

LACIV 132 (Rev. 07/13)
LASC Approved 10-03
For Optional Use

**NOTICE OF**
**CASE MANAGEMENT CONFERENCE**

Cal. Rules of Court, rules 3.720-3.730
LASC Local Rules, Chapter Three

| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES** | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>02/23/2023<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ S. Salo _____ Deputy |
| PLAINTIFF(S):<br>Tommy Alastra Productions, Inc. | |
| DEFENDANT(S):<br>Hugo McDonaugh, et al. | |
| **ORDER TO SHOW CAUSE HEARING** | CASE NUMBER:<br>23STCV03278 |

To the party / attorney of record:

You are ordered to appear for an Order to Show Cause Hearing on <u>06/15/2023</u> at <u>8:30 AM</u> in department <u>76</u> of this court, <u>Stanley Mosk Courthouse</u>,
and show cause why sanctions should not be imposed for:

[✔]    Failure to file proof of service.

Failure to comply or appear may result in sanctions pursuant to one or more of the following:  California Rules of Court, rule 2.30 and rule 3.1340; Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.310, 583.360, 583.410, 583.420, 583.430; and Government Code section 68608.

[✔]    To avoid a mandatory appearance all required documents must be filed at least 5 days prior to the date of the hearing.

Dated: <u>02/23/2023</u>

Christopher K. Lui / Judge
Judicial Officer

**ORDER TO SHOW CAUSE HEARING**

Cal. Rules of Court, rule 2.30
LASC Local Rules, Chapter 7

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>02/23/2023<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ S. Sato _____ Deputy |
| PLAINTIFF/PETITIONER:<br>Tommy Alastra Productions, Inc. | |
| DEFENDANT/RESPONDENT:<br>Hugo McDonaugh, et al. | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>23STCV03278 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Order to Show Cause Failure to File Proof of Service upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.

Michael E. Weinsten
Lavely & Singer, Professional Corporation
2049 Century Park East
Suite 2400
Los Angeles, CA 90067-2906

David W. Slayton, Executive Officer / Clerk of Court

Dated: 02/23/2023                    By: _S. Sato_____
                                              Deputy Clerk

**CERTIFICATE OF MAILING**

# DEPARTMENT 76

# NOTICE RE:  REMOTE APPEARANCES

## PLAINTIFF MUST SERVE A COPY OF THIS NOTICE ON ALL OTHER PARTIES ALONG WITH NOTICE OF THE INITIAL CASE MANAGEMENT CONFERENCE

The parties are also reminded that remote appearances must be reserved through the LA Court Connect system in advance.  Information regarding LA Court Connect is available online at https://my.lacourt.org/laccwelcome/.  **A party's failure to make a timely LA Court Connect reservation for a hearing or conference may result in the Court continuing the matter, or deeming that party to have waived their appearance.**

To assist parties in keeping track of their appearances, the LA Court Connect system provides a hearing reminder system that can provide e-mail or text message reminders of hearings two weeks or two days before hearings.  (https://hrs.courts.ca.gov/la)

Parties, counsel, and witnesses making remote appearances are subject to the conduct and attire requirements specified in Los Angeles Superior Court Local Rules ("L.R.") 3.42 and 3.43. Failure to comply with those requirements may result in the imposition of sanctions (L.R. 3.37) and/or the issuance of an order that the conference or hearing be continued with the noncompliant individual required to appear in person.  (CRC 3.672(d))

FEB 2 3 2023
_____
DATE

_____
CHRISTOPHER K. LUI
JUDGE, LOS ANGELES SUPERIOR COURT

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| TOMMY ALASTRA PRODUCTIONS, INC, a California corporation, | CASE NO.: 23STCV03278 |
| Plaintiff, | [Assigned for All Purposes to Hon. Christopher K. Lui, Dept. 76] |
| v. | **DECLARATION OF MARIE HANS** |
| HUGO MCDONAUGH, an individual; PERPETUAL ALTRUISM, LTD, a U.K. limited liability company; and DOES 1-20, inclusive, | |
| Defendants. | |

**EXHIBIT B**

IN THE **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

**CASE No. 23STCV03278**

TOMMY ALASTRA PRODUCTIONS,

INC, a California corporation,

Plaintiff,

vs.

HUGO MCDONAUGH, an individual;

PERPETUAL ALTRUISM LTD, a U.K.

Limited Liability Company; and DOES

1-20, inclusive

Defendants

# AFFIDAVIT OF SERVICE

I, ANTHONY BOOTH, Process Server of Green Process Serving, Suite 201, 186 St Albans Road, Watford, Hertfordshire, WD24 4AS, United Kingdom and for the purpose of service instructed by WP Tweed & Co, 21 Arlington St, St James's, London, SW1A 1RN, acting as agents for Lavely & Singer, 2049 Century Park, East Suite 2400, Los Angeles, California 90067-2906, Attorneys for the Plaintiff.

**Make Oath and Say as follows:**

1.    That I am over eighteen years of age and not party to this action.

2.    That I did on Wednesday 7th June 2023 at 13:11 hours attend at 2 Ordnance Mews, London, NW8 6PF, United Kingdom in an attempt to effect personal service of Summons, Complaint, Civil Cover Sheet, ADR Package, First Amended General Order, Notice of Case Assignment, Notice of Case Management, Conference, Warning and Summary and a covering letter from WP Tweed & Co on Hugo McDonaugh where I found the address to be a terrace property with a solid door at

the boundary with an entryphone. I knocked and rang the entryphone bell a number of times but obtained no reply. I spoke discreetly with an adult male leaving No.1 who advised he did not know Mr McDonaugh but believes the McDonaugh family reside in the property.

3. That I did on Wednesday 7th June 2023 at 13:11 hours attend at 2 Ordnance Mews, London, NW8 6PF, United Kingdom in an attempt to effect personal service of Summons, Complaint, Civil Cover Sheet, ADR Package, First Amended General Order, Notice of Case Assignment, Notice of Case Management, Conference, Warning and Summary and a covering letter from WP Tweed & Co on Perpetual Altruism Ltd where I found the address to be a terrace property with a solid door at the boundary with an entryphone. I knocked and rang the entryphone bell a number of times but obtained no reply. I spoke discreetly with an adult male leaving No.1 who advised he had no knowledge of Perpetual Altruism Ltd.

3. That I further attended at 2 Ordnance Mews, London, NW8 6PF, United Kingdom on Friday 9th June 2023 at 19:35 hours in an attempt to personally serve Hugo McDonaugh with the documents listed in Point 1 and Perpetual Altruism Ltd with the documents listed in Point 2 where I was unable to obtain a reply at the property.

4. That I further attended at 2 Ordnance Mews, London, NW8 6PF, United Kingdom on Monday 12th June 2023 at 11:55 hours in an attempt to personally serve Hugo McDonaugh with the documents listed in Point 1 and Perpetual Altruism Ltd with the documents listed in Point 2 where I met with an adult male, Black, 30s/40s, 5'8", medium build, shaven head who provided his name as Patrick and said that he has been a tenant here for a few months. He had no knowledge of Mr McDonaugh or Perpetual Altruism Ltd. I spoke with an adult female leaving No.1 who was unable to assist.

5. That on 13th June 2023 I was provided with a new address for Hugo McDonaugh and Perpetual Altruism Ltd of 51 De Walden House, Allitsen Road, London, NW8 7BA, United Kingdom.

6. That on Wednesday 14th June 2023 at 19:40 hours I attended at 51 De Walden House, Allitsen Road, London, NW8 7BA, United Kingdom in an attempt to personally serve Hugo McDonaugh with Summons, Complaint, Civil Cover Sheet, ADR Package, First Amended General Order, Notice of Case Assignment, Notice of Case Management, Conference, Warning and Summary and a covering letter from

WP Tweed & Co where I found the address to be a flat in a 4-storey block in a gated development. I rang the entryphone a number of times but I was unable to obtain a reply at the property.

7.  That on Wednesday 14th June 2023 at 19:40 hours I attended at 51 De Walden House, Allitsen Road, London, NW8 1BA, United Kingdom in an attempt to personally serve Perpetual Altruism Ltd with a Summons, Complaint, Civil Cover Sheet, ADR Package, First Amended General Order, Notice of Case Assignment, Notice of Case Management, Conference, Warning and Summary and a covering letter from WP Tweed & Co where I found the address to be a flat in a 4-storey block in a gated development. I rang the entryphone a number of times but I was unable to obtain a reply at the property.

8.  That I further attended at 51 De Walden House, Allitsen Road, London, NW8 1BA, United Kingdom, on Friday 16th June 2023 at 09:10 hours in an attempt to personally serve Hugo McDonaugh with the documents listed in Point 6 and to personally serve Perpetual Altruism Ltd with the documents listed in Point 7 where I was unable to obtain a reply at the property.

9.  That I further attended at 51 De Walden House, Allitsen Road, London, NW8 1BA, United Kingdom on Monday 19th June at 4:40pm in an attempt to personally Hugo McDonaugh with the documents listed in Point 6 and Perpetual Altruism Ltd with the documents listed in Point 7 but unfortunately again obtained no reply.

10. That on Wednesday 21st June 2023 I was instructed to serve the documents at Brock House, 19 Langham Street, London, W1W 6BP, United Kingdom.

11. That on Friday 23rd June 2023 at 13:10 hours I attended at Brock House, 19 Langham Street, London, W1W 6BP, United Kingdom, in an attempt to personally serve Hugo McDonaugh with a Summons, Complaint, Civil Cover Sheet, ADR Package, First Amended General Order, Notice of Case Assignment, Notice of Case Management, Conference, Warning and Summary and a covering letter from WP Tweed & Co where I found the address to be an office building occupied by 'The Office Group'. I met with Rachel Harrison who advised that they provide serviced offices and virtual accommodation address services. She confirmed Hugo McDonaugh was a virtual client and does not attend at this address and any mail for him is forwarded to him. She further went on to say they are not authorised to accept service on his behalf but any documents left would be forwarded on to him. I

therefore left the documents in a sealed envelope addressed to Hugo McDonaugh on the reception desk in her presence and she confirmed they would be passed on to him. She confirmed she was over 18 years old and I made her aware they were court documents.

12.     That I on Friday 23rd June 2023 at 13:10 hours I attended at Brock House, 19 Langham Street, London, W1W 6BP, United Kingdom, in an attempt to personally serve Perpetual Altruism Ltd with a Summons, Complaint, Civil Cover Sheet, ADR Package, First Amended General Order, Notice of Case Assignment, Notice of Case Management, Conference, Warning and Summary and a covering letter from WP Tweed & Co where I found the address to be an office building occupied by 'The Office Group'. I met with Rachel Harrison who advised that they provide serviced offices and virtual accommodation address services. She confirmed Perpetual Altruism Ltd are a virtual client and do not attend at this address and any mail for them is forwarded to them. She further went on to say they are not authorised to accept service on their behalf but any documents left would be forwarded on to them. I therefore left the documents in a sealed envelope addressed to Perpetual Altruism Ltd on the reception desk in her presence and she confirmed they would be passed on to them. She confirmed she was over 18 years old and I made her aware they were court documents.

13.     I believe the facts stated in this Affidavit of service are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

SWORN AT:        Collins Solicitors
                 20 Station Road
                 Watford
                 WD17 1AR                                          )
                                                                   )
                                                                   )
                                                                   )
                                                                   )          Anthy Booth
                                                                   )
                                                                   )
                                                                   )
in the County of Hertfordshire                                     )
This 30th day of JUNE 2023                                         )
Before me                                  ANNA                    )
A Solicitor / Commissioner for Oaths       MURDOCK                 )

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| TOMMY ALASTRA PRODUCTIONS, INC, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>HUGO MCDONAUGH, an individual; PERPETUAL ALTRUISM, LTD, a U.K. limited liability company; and DOES 1-20, inclusive,<br><br>Defendants. | CASE NO.: 23STCV03278<br><br>[Assigned for All Purposes to Hon. Christopher K. Lui, Dept. 76]<br><br>**DECLARATION OF MARIE HANS** |

**EXHIBIT C**

The Securities and Exchange Commission has not necessarily reviewed the information
in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

## 1. Issuer's Identity

CIK (Filer ID Number)    Previous Names  [X] None    Entity Type

0001814718

Name of Issuer

Perpetual Altruism ltd

Jurisdiction of Incorporation/Organization

UNITED KINGDOM

Year of Incorporation/Organization

[ ] Over Five Years Ago

[X] Within Last Five Years (Specify Year) 2018

[ ] Yet to Be Formed

Entity Type:
[ ] Corporation
[ ] Limited Partnership
[X] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

---

## 2. Principal Place of Business and Contact Information

Name of Issuer

Perpetual Altruism ltd

| Street Address 1 | Street Address 2 |
| --- | --- |
| Brock House | 19 Langham Street |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
| --- | --- | --- | --- |
| LONDON | UNITED KINGDOM | W1W 6BP | 07760461809 |

---

## 3. Related Persons

| Last Name | First Name | Middle Name |
| --- | --- | --- |

SEC FORM D

McDonaugh                          Hugo
Street Address 1                   Street Address 2
51 De Walden House                 Allitsen Road
City                               State/Province/Country        ZIP/PostalCode
London                             UNITED KINGDOM                NW87BA

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

Last Name                          First Name                    Middle Name
Bessire                            Edouard
Street Address 1                   Street Address 2
17A Bryanston Square
City                               State/Province/Country        ZIP/PostalCode
London                             UNITED KINGDOM                W1H2DP

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

## 4. Industry Group

[ ] Agriculture

Banking & Financial Services

  [ ] Commercial Banking

  [ ] Insurance

  [ ] Investing

  [ ] Investment Banking

  [ ] Pooled Investment Fund

  Is the issuer registered as an investment company under the Investment Company Act of 1940?

  [ ] Yes  [ ] No

  [ ] Other Banking & Financial Services

[ ] Business Services

Energy

Health Care

  [ ] Biotechnology

  [ ] Health Insurance

  [ ] Hospitals & Physicians

  [ ] Pharmaceuticals

  [ ] Other Health Care

[ ] Manufacturing

Real Estate

  [ ] Commercial

  [ ] Construction

  [ ] REITS & Finance

  [ ] Residential

  [ ] Other Real Estate

[ ] Retailing

[ ] Restaurants

Technology

  [ ] Computers

  [ ] Telecommunications

  [X] Other Technology

Travel

  [ ] Airlines & Airports

  [ ] Lodging & Conventions

  [ ] Tourism & Travel Services

  [ ] Other Travel

[ ] Other

☐ Coal Mining

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| ☐ No Revenues | | ☐ No Aggregate Net Asset Value |
| ☒ $1 - $1,000,000 | | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | | ☐ Over $100,000,000 |
| ☐ Decline to Disclose | | ☐ Decline to Disclose |
| ☐ Not Applicable | | ☐ Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

| | |
|---|---|
| ☐ Rule 504(b)(1) (not (i), (ii) or (iii)) | ☐ Investment Company Act Section 3(c) |
| ☐ Rule 504 (b)(1)(i) | ☐ Section 3(c)(1)    ☐ Section 3(c)(9) |
| ☐ Rule 504 (b)(1)(ii) | ☐ Section 3(c)(2)    ☐ Section 3(c)(10) |
| ☐ Rule 504 (b)(1)(iii) | ☐ Section 3(c)(3)    ☐ Section 3(c)(11) |
| ☒ Rule 506(b) | ☐ Section 3(c)(4)    ☐ Section 3(c)(12) |
| ☐ Rule 506(c) | ☐ Section 3(c)(5)    ☐ Section 3(c)(13) |
| ☐ Securities Act Section 4(a)(5) | ☐ Section 3(c)(6)    ☐ Section 3(c)(14) |

6/9/23, 2:07 PM                                                 SEC FORM D

☐ Section 3(c)(7)

## 7. Type of Filing

[X] New Notice    Date of First Sale [X] First Sale Yet to Occur

☐ Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?    ☐ Yes [X] No

## 9. Type(s) of Securities Offered (select all that apply)

[X] Equity                                              ☐ Pooled Investment Fund Interests

☐ Debt                                                  ☐ Tenant-in-Common Securities

☐ Option, Warrant or Other Right to Acquire             ☐ Mineral Property Securities
   Another Security

☐ Security to be Acquired Upon Exercise of              ☐ Other (describe)
   Option, Warrant or Other Right to Acquire
   Security

## 10. Business Combination Transaction

Is this offering being made in connection with a business
combination transaction, such as a merger, acquisition or          ☐ Yes [X] No
exchange offer?

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $50,000 USD

## 12. Sales Compensation

Recipient                                    Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None       (Associated) Broker or Dealer      [X] None
                                             CRD Number

Street Address 1                             Street Address 2

City                                         State/Province/Country              ZIP/Postal
                                                                                 Code

State(s) of Solicitation (select   ☐ All     ☐ Foreign/non-US
all that apply)                      States

6/9/23, 2:07 PM                                                    SEC FORM D

Check "All States" or check
individual States

## 13. Offering and Sales Amounts

Total Offering Amount        $5,000,000 USD  or [ ] Indefinite

Total Amount Sold              $0 USD

Total Remaining to be Sold $5,000,000 USD  or [ ] Indefinite

Clarification of Response (if Necessary):

## 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who
do not qualify as accredited investors, and enter the number of such non-
accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to     | 0 |
persons who do not qualify as accredited investors, enter the total number of
investors who already have invested in the offering:

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the
amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [ ] Estimate

Finders' Fees $0 USD [ ] Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for
payments to any of the persons required to be named as executive officers, directors or promoters
in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next
to the amount.

$200,000 USD [X] Estimate

Clarification of Response (if Necessary):

The invested funds are being used to fund working capital. The payments described above in this item 16
include only potential salary payments to the Directors as described in item 3 of this form.

## Signature and Submission

SEC FORM D

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|--------|-----------|----------------|-------|------|
| Perpetual Altruism ltd | Hugo McDonaugh | Hugo McDonaugh | Director | 2023-01-20 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| TOMMY ALASTRA PRODUCTIONS, INC, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>HUGO MCDONAUGH, an individual; PERPETUAL ALTRUISM, LTD, a U.K. limited liability company; and DOES 1-20, inclusive,<br><br>Defendants. | CASE NO.: 23STCV03278<br><br>[Assigned for All Purposes to Hon. Christopher K. Lui, Dept. 76]<br><br>**DECLARATION OF MARIE HANS** |

EXHIBIT D

# Cookies on Companies House services

We use some essential cookies to make our services work.

We'd also like to use analytics cookies so we can understand how you use our services and to make improvements.

Accept analytics cookies

Reject analytics cookies

View cookies

# 👑 GOV.UK

## Find and update company information

Companies House does not verify the accuracy of the information filed (http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)
Advanced company search (/advanced-search)

PERPETUAL ALTRUISM LIMITED

Company number **11219425**

Follow this company

File for this company (https://beta.companieshouse.gov.uk/company/11219425/authorise?return_to=/company/11219425)

— Overview (https://beta.companieshouse.gov.uk/company/11219425)

— Filing history (https://beta.companieshouse.gov.uk/company/11219425/filing-history)

— People (https://beta.companieshouse.gov.uk/company/11219425/officers)

— More (https://beta.companieshouse.gov.uk/company/11219425/more)

Registered office address
    Brock House, 19 Langham Street, London, England, W1W 6BP

Company status
    Active

Company type
       Private limited Company

Incorporated on
       22 February 2018

## Accounts

Next accounts made up to **28 February 2024**
due by **30 November 2024**

Last accounts made up to **28 February 2023**

## Confirmation statement

Next statement date **4 November 2023**
due by **18 November 2023**

Last statement dated **4 November 2022**

## Nature of business (SIC)

- 82990 - Other business support service activities not elsewhere classified

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/company/11219425)

Policies Link opens in new tab

Cookies (https://beta.companieshouse.gov.uk/help/cookies)

Contact us Link opens in new tab

Accessibility statement
(https://beta.companieshouse.gov.uk/help/accessibility-statement)

Developers Link opens in new tab

Built by Companies House                    © Crown copyright

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| TOMMY ALASTRA PRODUCTIONS, INC, a California corporation, | CASE NO.: 23STCV03278 |
| Plaintiff, | [Assigned for All Purposes to Hon. Christopher K. Lui, Dept. 76] |
| v. | **DECLARATION OF MARIE HANS** |
| HUGO MCDONAUGH, an individual; PERPETUAL ALTRUISM, LTD, a U.K. limited liability company; and DOES 1-20, inclusive, | |
| Defendants. | |

## EXHIBIT E

# Cookies on Companies House services

We use some essential cookies to make our services work.

We'd also like to use analytics cookies so we can understand how you use our services and to make improvements.

Accept analytics cookies

Reject analytics cookies

View cookies

# 👑 GOV.UK

# Find and update company information

Companies House does not verify the accuracy of the information filed (http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)
Advanced company search (/advanced-search)

PERPETUAL ALTRUISM LIMITED

Company number **11219425**

Follow this company

File for this company (https://beta.companieshouse.gov.uk/company/11219425/authorise?
return_to=/company/11219425/officers)

— Overview (https://beta.companieshouse.gov.uk/company/11219425)

— Filing history (https://beta.companieshouse.gov.uk/company/11219425/filing-history)

— People (https://beta.companieshouse.gov.uk/company/11219425/officers)

— More (https://beta.companieshouse.gov.uk/company/11219425/more)

- Officers
- Persons with significant control (/company/11219425/persons-with-significant-control)

# Filter officers

☐
Current officers

Apply filter

# 3 officers / 0 resignations

### BESSIRE, Edouard

Correspondence address **Brock House, 19 Langham Street, London, England, W1W 6BP**

Role Active **Director**

Date of birth **December 1991**

Appointed on **21 May 2018**

Nationality **French**

Country of residence **England**

Occupation **Entrepreneur**

### CACHIA, Mark Emanuel

Correspondence address **Brock House, 19 Langham Street, London, England, W1W 6BP**

Role Active **Director**

Date of birth **March 1972**

Appointed on **24 January 2022**

Nationality **Maltese,American**

Country of residence **United Arab Emirates**

Occupation **Fund Manager**

### MCDONAUGH, Hugo

Correspondence address **Brock House, 19 Langham Street, London, England, W1W 6BP**

Role Active **Director**

Date of birth **March 1992**

Appointed on **22 February 2018**

Nationality **British**

Country of residence **United Kingdom**

Occupation **Director**

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/company/11219425/officers)

Policies Link opens in new tab

Cookies (https://beta.companieshouse.gov.uk/help/cookies)

Contact us Link opens in new tab

Accessibility statement (https://beta.companieshouse.gov.uk/help/accessibility-statement)

Developers Link opens in new tab

Built by Companies House                                                © Crown copyright

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| TOMMY ALASTRA PRODUCTIONS, INC, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>HUGO MCDONAUGH, an individual; PERPETUAL ALTRUISM, LTD, a U.K. limited liability company; and DOES 1-20, inclusive,<br><br>Defendants. | CASE NO.: 23STCV03278<br><br>[Assigned for All Purposes to Hon. Christopher K. Lui, Dept. 76]<br><br>**DECLARATION OF MARIE HANS** |

EXHIBIT F

KF 2023 – 001444

## CERTIFICATE
### ATTESTATION

The undersigned authority has the honour to certify, in conformity with Article 6 of the Convention,
L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,

☑ **1. that the document has been served***
que la demande a été exécutée*

| — the (date) / le (date): | 21/06/23 |
|---|---|
| — at (place, street, number): <br> à (localité, rue, numéro) : | Brock House, 19 Langham Street, |

— in one of the following methods authorised by Article 5:
dans une des formes suivantes prévues à l'article 5 :

☑ a)  **in accordance with the provisions of sub-paragraph a) of the first paragraph of Article 5 of the Convention***
selon les formes légales (article 5, alinéa premier, lettre a))*

☐ b)  **in accordance with the following particular method***:
selon la forme particulière suivante* :

☐ c)  **by delivery to the addressee, if he accepts it voluntarily***
par remise simple*

The documents referred to in the request have been delivered to:
Les documents mentionnés dans la demande ont été remis à :

| Identity and description of person: <br> Identité et qualité de la personne : | Rachel Harrison receptionist at Brock House <br> for the attention of the CEO of Perpetual Altruism |
|---|---|
| Relationship to the addressee (family, business or other): <br> Liens de parenté, de subordination ou autres, avec le destinataire de l'acte : | Receptionist at the company's registered office address FAO the CEO of Perpetual Altruism Ltd |

☐ **2. that the document has not been served, by reason of the following facts***:
que la demande n'a pas été exécutée, en raison des faits suivants* :

☐ **In conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement***.
Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint*.

*Annexes / Annexes*

| Documents returned: <br> Pièces renvoyées : | |
|---|---|
| In appropriate cases, documents establishing the service: <br> Le cas échéant, les documents justificatifs de l'exécution : | |

* If appropriate / s'il y a lieu

| Done at / Fait à  RC London | Signature and/or stamp <br> Signature et / ou cachet |
|---|---|
| The / le  24th July 2023 | |

**Roger Eastman**
Master of the Queen's Bench Division,
Room E116, Royal Courts of Justice,
London WC2A 2LL

KF 2023 - 001456

# CERTIFICATE
## ATTESTATION

The undersigned authority has the honour to certify, in conformity with Article 6 of the Convention,
L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,

☑ 1. that the document has been served*
    que la demande a été exécutée*

| — the (date) / le (date): | 21/06/23 |
|---|---|
| — at (place, street, number):<br>à (localité, rue, numéro) : | Hugo McDonaugh |

| — in one of the following methods authorised by Article 5:<br>dans une des formes suivantes prévues à l'article 5 : | |
|---|---|
| ☑ | a) **in accordance with the provisions of sub-paragraph a) of the first paragraph of Article 5 of the Convention***<br>selon les formes légales (article 5, alinéa premier, lettre a))* |
| ☐ | b) **in accordance with the following particular method***:<br>selon la forme particulière suivante* : |
| ☐ | c) **by delivery to the addressee, if he accepts it voluntarily***<br>par remise simple* |

The documents referred to in the request have been delivered to:
Les documents mentionnés dans la demande ont été remis à :

| Identity and description of person:<br>Identité et qualité de la personne : | Rachel Harrison receptionist at Brock House for the attention of the Hugo McDonaugh of Perpetual Altruism Ltd |
|---|---|
| **Relationship to the addressee (family, business or other):**<br>Liens de parenté, de subordination ou autres, avec le destinataire de l'acte : | Receptionist at the company's registered office address FAO Hugo McDonaugh |

☐ 2. that the document has not been served, by reason of the following facts*:
    que la demande n'a pas été exécutée, en raison des faits suivants*:

|  |
|---|
|  |

☐ In conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement*.
Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint*.

*Annexes / Annexes*

| Documents returned:<br>Pièces renvoyées : |  |
|---|---|
| **In appropriate cases, documents establishing the service:**<br>Le cas échéant, les documents justificatifs de l'exécution : |  |

* if appropriate / s'il y a lieu

| Done at / F... London | Signature and/or stamp<br>Signature et / ou cachet |
|---|---|
| The / le 24h July 2023 | |



Roger Eastman
Master of the Queen's Bench Division,
Room E116, Royal Courts of Justice,
London WC2A 2LL

Permanent Bureau July 2017

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| TOMMY ALASTRA PRODUCTIONS, INC, a California corporation, | CASE NO.: 23STCV03278 |
| Plaintiff, | [Assigned for All Purposes to Hon. Christopher K. Lui, Dept. 76] |
| v. | **DECLARATION OF MARIE HANS** |
| HUGO MCDONAUGH, an individual; PERPETUAL ALTRUISM, LTD, a U.K. limited liability company; and DOES 1-20, inclusive, | |
| Defendants. | |

EXHIBIT G

## CERTIFICATE
### ATTESTATION

The undersigned authority has the honour to certify, in conformity with Article 6 of the Convention,
L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,

☑ 1. that the document has been served*
   que la demande a été exécutée*

| — the (date) / le (date): | 26/06/23 |
|---|---|
| — at (place, street, number): <br> à (localité, rue, numéro) : | 51De Walden House, Allisten Road, |

— in one of the following methods authorised by Article 5:
dans une des formes suivantes prévues à l'article 5 :

☑ a) in accordance with the provisions of sub-paragraph a) of the first paragraph of
   Article 5 of the Convention*
   selon les formes légales (article 5, alinéa premier, lettre a))*

☐ b) in accordance with the following particular method*:
   selon la forme particulière suivante* :

☐ c) by delivery to the addressee, if he accepts it voluntarily*
   par remise simple*

The documents referred to in the request have been delivered to:
Les documents mentionnés dans la demande ont été remis à :

| Identity and description of person: <br> Identité et qualité de la personne : | Mr Hugo McDonaugh On Behalf of <br> Perpetual Altruism Ltd |
|---|---|
| Relationship to the addressee (family, <br> business or other): <br> Liens de parenté, de subordination ou autres, avec le <br> destinataire de l'acte : | Director and person holding a senior position within the company |

☐ 2. that the document has not been served, by reason of the following facts*:
   que la demande n'a pas été exécutée, en raison des faits suivants*:

☐ In conformity with the second paragraph of Article 12 of the Convention, the applicant is
requested to pay or reimburse the expenses detailed in the attached statement*.
Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais
dont le détail figure au mémoire ci-joint*.

Annexes / Annexes

| Documents returned: <br> Pièces renvoyées: | |
|---|---|
| In appropriate cases, documents establishing <br> the service: <br> Le cas échéant, les documents justificatifs de <br> l'exécution : <br> * if appropriate / s'il y a lieu | |
| Done at / Fait à <br><br> The / le  4/August/23, | Signature and/or stamp <br> Signature et / ou cachet |



Master David Cook
Room E112
Royal Courts of Justice
London, WC2A 2LL

# CERTIFICATE
## ATTESTATION

The undersigned authority has the honour to certify, in conformity with Article 6 of the Convention,

L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention.

☑ 1. that the document has been served*

    que la demande a été exécutée*

| — the (date) / le (date): | 26/06/23 |
|---|---|
| — at (place, street, number):<br>à localité rue numéro) : | 51 DeWalden House, Allitsen Road, |

— in one of the following methods authorised by Article 5:

dans une des formes suivantes prévues à l'article 5 :

☑   *a)*   **in accordance with the provisions of sub-paragraph *a)* of the first paragraph of Article 5 of the Convention***

      selon les formes légales (article 5, alinéa premier, lettre a))*

☐   *b)*   **in accordance with the following particular method*:**

      selon la forme particulière suivante* :

☐   *c)*   **by delivery to the addressee, if he accepts it voluntarily***

      par remise simple*

The documents referred to in the request have been delivered to:

Les documents mentionnés dans la demande ont été remis à :

| Identity and description of person:<br>Identité et qualité de la personne : | Mr Hugo McDonaugh |
|---|---|
| Relationship to the addressee (family, business or other):<br>Liens de parenté, de subordination ou autres, avec le destinataire de l'acte : | In his personal capacity |

☐ 2. that the document has not been served, by reason of the following facts*:

    que la demande n'a pas été exécutée, en raison des faits suivants*:

☐ In conformity with the second paragraph of Article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement*.

    Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint*.

*Annexes / Annexes*

| Documents returned:<br>Pièces renvoyées : | |
|---|---|
| In appropriate cases, documents establishing the service:<br>Le cas échéant, les documents justificatifs de l'exécution :<br>* if appropriate / s'il y a lieu | |

| Done at / Fait à | Signature and/or stamp<br>Signature et / ou cachet |
|---|---|
| The / le   4 Novb 2023 | *Daniel Cook* |

0 4 AUG 2023



Master David Cook

Room E112
Royal Courts of Justice
London, WC2A 2LL

## <u>PROOF OF SERVICE</u>

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

     I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 2049 Century Park East, Suite 2400, Los Angeles, California 90067.

     On the date indicated below, I served the foregoing document described as:
**SUPPLEMENTAL PROOF OF SERVICE OF SUMMONS AND COMPLAINT ON DEFENDANT PERPETUAL ALTRUISM, LTD.**
on the interested parties in this action by placing a true and correct copy thereof enclosed in sealed envelopes addressed as follows:

Ryan M. Lapine
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
*Attorneys for Defendants Hugo Mcdonaugh and Perpetual Altruism, Ltd.*

**[X]    BY MAIL:**  As follows:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.
and

| | |
|---|---|
| Hugo Mcdonaugh | Perpetual Altruism, Ltd. |
| c/o Perpetual Altruism, Ltd. | Brock House |
| Brock House | 19 Langham Street |
| 19 Langham Street | London W1W 6BP |
| London W1W 6BP | United Kingdom |
| United Kingdom | *Defendant* |
| *Defendant* | |

**[X]    BY OVERNIGHT DELIVERY:**  I served such envelope or package to be delivered on the same day to an authorized courier or driver authorized by the overnight service carrier to receive documents, in an envelope or package designated by the overnight service carrier.

     I declare under penalty of perjury under the laws of the State of California that the above is true and correct.  Executed August 8, 2023, at Los Angeles, California.

_____
Lisa Carpenter

3