EXHIBIT 1

## EQUITY, COMPENSATION AND REVENUE SHARING AGREEMENT

**THIS EQUITY, COMPENSATION AND REVENUE SHARING AGREEMENT** (this "Agreement") is made and entered into as of the 6th day of April 2020 (the "Effective Date"), by and between Tommy Alastra Productions Inc., a California corporation, with an address 3252 Oakshire Dr, Los Angeles, CA 90068, and Perpetual Altruism Ltd. (reg. no. 11219425), a limited company formed under the laws of the United Kingdom, with address 2 Ordnance Mews, London, NW86PF.

NOW, THEREFORE, in consideration of the representations, warranties, covenants, agreements and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as stated below.

| | |
|---|---|
| **1. Parties and related people** | The parties to this Agreement are Tommy Alastra Productions Inc., a California corporation listed above (collectively with its affiliates, successors and assigns, "TAP"), and Perpetual Altruism Ltd. (reg. no. 11219425), a limited company incorporated in the United Kingdom listed above (the "Company"). The Company and TAP shall be each be referred to herein as a "Party" and collectively as the "Parties". |
| | Mr. Tommy Alastra, with an address of 3252 Oakshire Dr, Los Angeles, CA 90068, is not a party to this Agreement but is defined collectively with TAP and their respective heirs, successors, affiliates and assigns as "Alastra". |
| | Neither Mr. John Bryan nor The Watley Group LLC, a California limited liability company ("TWG"), each with an address of 8491 W. Sunset Blvd, Suite 107, West Hollywood, CA 90069 (Mr. Bryan, collectively with TWG and their respective affiliates, heirs, successors and assigns shall be collectively defined as "Bryan"), are parties to this Agreement. |
| **2. Equity and Warrants Issuance** | The Company shall, on or prior to the Issuance Date (as defined below), amend its articles of association in order to create a new class of ordinary shares of £0.0001 each in the capital of the Company which shall rank pari passu in all rights, preferences and otherwise with the existing ordinary shares of the Company save that the new class of share shall not have any voting rights (the "Ordinary 1 Shares"). |
| | As consideration for TAP's past business services provided toward the preparation, growth and launch of the Company Platform (as defined below) (the "Services"), the Company shall issue to TAP, on the earlier of (such date shall be referred to herein as the "Issuance Date") (i) December 1, 2020 and (ii) the closing date of the Company's current £400,000 financing round (the "Financing"), new Ordinary 1 Shares, representing 3.75% of the Fully Diluted Shares Outstanding as of the Issuance Date (the "Shares"), and TAP warrants to purchase Ordinary 1 Shares, representing 3.75% of the Fully Diluted Shares Outstanding as of the Issuance Date (the "Warrants"). The exercise price of the Warrants shall be calculated based on the total fully diluted post-financing valuation of the Company being equal to £5,150,000. The |

term of the Warrants shall be 60 months from the Issuance Date, and the Warrants shall include standard and customary cashless exercise and other provisions and shall be in the form of a warrant instrument as mutually agreeable to TAP and the Company.  For the avoidance of doubt, the Parties agree that (x) TAP is entitled to, fully vested in and has earned in full, the Shares and the Warrants (as defined below) as of the Effective Date, and (y) the Company shall be obligated to issue to TAP the Shares and the Warrants whether or not the Company consummates the Financing by December 1, 2020 or at all.

"Fully Diluted Shares Outstanding" shall mean, with respect to the Company, as of the Issuance Date, the sum of: (a) the aggregate number of issued and allotted shares in the capital of the Company, (b) such additional shares in the capital of the Company which would have been issued if all Equity Securities (as defined in section 560(1) of the Companies Act 2006) which have been granted or issued by the Company had been exercised or converted to their maximum extent, including, without limitation: (i) the conversion of any and all outstanding convertible securities and other convertible instruments issued by the Company (including, without limitation, in the Financing), and (ii) the exercise of all outstanding options, warrants, equity awards, promised equity awards and other rights, agreements and arrangements entitling any holder to purchase or acquire shares of capital stock or other equity interests of the Company; (c) all Equity Securities which the Company has agreed to issue (whether conditionally or otherwise), or which are authorized to be issued under any equity incentive, stock or similar plan of the Company or any equity incentive, stock or similar plan to be created or increased in connection with the Financing; and (d) any shares issued or to be issued to TAP pursuant to this Agreement (including, without limitation, the Warrants) and any shares issued or to be issued to TWG pursuant to the terms of an agreement similar to this Agreement (including, without limitation, TWG's warrants) to be entered into between the Company and TWG on or around the date of this agreement.

The Company agrees that if at any time it enters into any agreement or arrangement that grants any shareholder of the Company, any holder of any Company securities or any other person (i) anti-dilution protection in respect of any shares in the capital of the Company or other securities of the Company held by them, now or in the future, and/or (ii) the right to acquire additional equity in the Company as a result of anti-dilution like or similar provisions that contains terms and conditions more favorable to such person when such agreement or arrangement is compared to this Agreement, on a "whole agreement" basis (in each case, a "More Favorable Equity Agreement"), then the Company shall promptly provide notice to TAP of such event and offer to grant to TAP equivalent anti-dilution protection or terms in respect of the Ordinary 1 Shares held by TAP and the Warrants, retroactive to

2

| | |
|---|---|
| | the date upon which the More Favorable Equity Agreement was effective. |
| | Furthermore, the Company agrees that any future issuances, made during the next five years, by the Company of any Equity Securities or any securities convertible into Equity Securities or equity capital of the Company shall be approved by the Company's Board of Directors (the "Board") or a majority of the independent directors of the Company, if any, as a condition of such issuance. |
| | The issuance of the Shares and the Warrants shall be in full and final settlement of any liability whatsoever owed by the Company to TAP in respect of the Services provided up to and as of the Effective Date. |
| **3. Revenue Sharing** | **(i) Perpetual revenue share on Relevant Cryptographs** |
| | TAP shall receive, from the Effective Date in perpetuity, compensation equal to 2.5% of any and all Relevant Cryptograph Revenues received by the Company Group (as defined below), that originate as a result of or are generated by or through Bryan or Alastra or their Leads or by or through any other Affiliate Lead Generator (as defined below). For the avoidance of doubt, such Relevant Cryptograph Revenues shall also include any and all Affiliate Lead Revenues. |
| | For the avoidance of doubt, if (A) a new Lead originates through Alastra (or Bryan or by or through any other Affiliate Lead Generator) at any time in the future, or (B) the Company Group receives any Relevant Cryptograph Revenues as a result of or that are generated by or through any Lead or other Affiliate Lead Generator, then in either case TAP shall receive compensation equal to 2.5% of such Relevant Cryptograph Revenues (including, without limitation, for any and all Relevant Cryptographs created by or through such Lead) as its Relevant Cryptograph Revenue Share in perpetuity. |
| | **(ii) Five year revenue share on Company Revenues (excluding Relevant Cryptograph Revenues)** |
| | For a five-year period following the Effective Date, TAP shall also receive compensation equal to 2.0% of any and all Company Revenues. |
| | "Company Revenues" shall mean all revenues actually received by the Company and/or any of its subsidiaries, affiliates, assigns or successors (collectively, the "Company Group") excluding Relevant Cryptograph Revenues, Enhanced Relevant Cryptograph Revenues, Other Deal Revenues, and Existing Cryptograph Revenues. For the avoidance of doubt, the compensation percentage provided in this Section 3(ii) shall not be paid in addition to the compensation percentage paid pursuant to Section 3(i) above. |
| | "Affiliate Lead Revenues" shall mean any and all Revenues derived from or as a result of (x) any and all Cryptographs (as defined below) that are |

3

listed on Exhibit A attached hereto, and (y) the sale, distribution, publication, exploitation, use, monetization, display, licensing, allied, ancillary and/or subsidiary rights with respect to the Cryptographs in any and all media now known or hereafter devised created by any Creator and/or the Company Group.

(iii) **Perpetual revenue share on Existing Cryptographs**

TAP shall also receive, from the Effective Date in perpetuity, compensation equal to 0.5% of any and all Existing Cryptograph Revenues.

"Existing Cryptograph Revenues" shall mean the gross revenues actually received by any member of the Company Group (including, without limitation, as a result of the sale, distribution, publication, exploitation, use, monetization, display, licensing, ancillary and/or subsidiary rights or other exploitation of any Existing Cryptograph) less the Deductions.

"Existing Cryptographs" means the 12 existing Cryptographs listed on the Exhibit B attached hereto that have been originated by the Company prior to the inception of TAP's relationship with the Company.

"Company Platform" shall have the meaning as defined in Section 7 of this Agreement.

"Cryptographs" shall mean any use of the Company Platform linking the Company Group's tokens and any intellectual property, physical property, rights and/or intellectual property rights granted, created, invented, written, assigned, licensed, transferred or acquired by, or otherwise published, exploited, advertised and/or accepted by, any Company Group member, including, but not limited to, any cryptographs, or underlying cryptographs, their contents and copyrights therein and any derivative works thereof and rights therein.

"Relevant Cryptograph Revenues" shall mean the gross revenues in any way derived on or through the Company Platform actually received or generated by any member of the Company Group from any Relevant Cryptograph (including, without limitation, as a result of the sale, distribution, publication, exploitation, use, monetization, display, licensing, allied, ancillary and/or subsidiary rights or other exploitation of any Relevant Cryptograph) less the Deductions.

"Relevant Cryptograph" means (i) the Cryptographs resulting from any of the Leads listed in Exhibit A and (ii) any Cryptograph that is part of a deal introduced to any Company Group member by or through Alastra or Bryan or their Leads or by or through any other Affiliate Lead Generator, and which is accepted by the Company, pursuant to the process outlined in Section 5 of this Agreement, as a Cryptograph to be exploited on and through the Company Platform. Relevant Cryptographs shall not include any of the Cryptographs set forth in Exhibit B.

4

| | |
|---|---|
| | "Revenue Shares" means the share of the revenue payable under Sections 3 and 4 of this Agreement. |
| | "Deductions" means, in relation to any Relevant Cryptograph or Existing Cryptograph (x) any applicable VAT company taxes charged by the Company directly in relation to the specific Cryptograph, (y) any applicable currency conversion costs and bank transfer fees incurred by the Company directly in relation to the specific Cryptograph and (z) any direct, necessary and well-documented out-of-pocket costs and expenses (excluding fixed costs of the Company Group) incurred by the Company directly in procuring the talent to participate in the creation of the specific Cryptograph. For the avoidance of doubt, Deductions shall not include any amortization, liabilities or other non-cash amounts or expenses, whether or not related to Existing Cryptographs or Relevant Cryptographs, as applicable. |
| | "Relevant Cryptograph Revenue Share" shall mean percentage of Relevant Cryptograph Revenues to be paid to TAP as set forth in this Agreement. |
| | The parties acknowledge and agree that TAP's rights to receive Revenue Shares pursuant to this Section 3 shall also include any and all Relevant Cryptographs created by any creators who were initially introduced to the Company, directly or indirectly, through Alastra, Bryan, their Leads and/or Affiliate Lead Generator.  Revenues Shares payable to TAP pursuant to Sections 3 and 4 hereof shall be paid by the Company to TAP no later than 30 calendar days of the end of each calendar month after the receipt in cleared funds of the applicable revenues actually received by the Company. At that time a reasonably detailed statement of revenue shares compensation due to TAP will be sent to TAP via electronic mail, and payment to TAP remitted by bank cashier's check or checks or electronic wire transfer of immediately available funds to a bank account designated by TAP. |
| | TAP shall also have the right, but not an obligation, in its sole discretion to temporarily waive or forfeit any portion of its Revenue Share rights granted in this Section 3 for the purpose of increasing the marketability to investors and/or potential buyers resulting in a mutually beneficial scenario for TAP and the Company. |
| **4. Enhanced Deal Revenue Share, and Other Deals Revenue Share** | (i) At all relevant time periods before and after the Effective Date, in the event that TAP or TWG negotiates a more favorable deal, agreement or arrangement whereby a Relevant Cryptograph generates in excess of 25% revenue share for any member of the Company Group, TAP shall receive ¼ (or 25%) of the Relevant Cryptograph Revenue in excess of that received by the Company Group ("**Enhanced Relevant Cryptograph Revenues**"). |
| | For the avoidance of doubt and by way of an example, if TAP or TWG negotiates a Relevant Cryptograph deal with a Creator that originates, directly or indirectly, through Alastra or Bryan (or any of their Leads or |

5

| | |
|---|---|
| | other Affiliate Lead Generators), whereby the revenue split between (1) the Creator and the charity (taken together) and (2) the Company is 50/50, then TAP shall be entitled to the Relevant Cryptograph Revenue Share equal to 2.5% (*i.e.*, TAP's normal revenue share for their Lead pursuant to Section 3 above), plus 6.25% (*i.e.*, one-fourth of the difference between 50% and 25% (or 25%/4), for a total revenue share of 8.75%. |
| | (ii) In addition, TAP shall receive, from the Effective Date in perpetuity, compensation equal to 25% (or any higher or lower percentage as TAP agrees to in writing in good faith in its sole discretion taking the Company's deal business expenses into account) of any and all Other Deal Revenues. |
| | "Other Deal Revenues" means revenues received by the Company Group from any deal, transaction, contract, agreement or arrangement (collectively, "Deals") accepted by the Company in writing (pursuant to the process set forth in Section 5) that originate as a result of or are generated by or through Alastra or Bryan or their Leads or by or through any other Affiliate Lead Generator that do not relate to Cryptographs. |
| **5. Various Definitions** | A "Lead" shall mean (1) a business or financing referral that is initiated, directly or indirectly, by Alastra or Bryan (2) the persons set forth on Exhibit A, and (3) the Investor Leads (as defined below), and (4) any other business referrals first introduced to the Company Group, directly or indirectly, through or by such Lead, any affiliates of such Lead or any Affiliate Lead Generator, in each case if the initial Lead introduction was accepted by the Company under the process set out below in this section 5. |
| | A "Creator" means a person introduced to the Company Group directly or indirectly by Bryan or Alastra or through or by any of their Leads, any affiliates of such Leads or any persons introduced, directly or indirectly, by such Lead or affiliates of such Lead, who has created a Relevant Cryptograph and provided the Company Group with copies of the Relevant Cryptograph for purposes of publishing, distributing and monetizing the Cryptograph (including, without limitation, the persons set forth on Exhibit A). |
| | An "Affiliate Lead Generator" shall mean a person that has been introduced to the Company Group, directly or indirectly, by Alastra or Bryan or through or by any of their Leads, any affiliates of such Leads or any persons introduced, directly or indirectly, by such Lead or affiliates of such Lead, or through or by any Creator introduced by Alastra or Bryan, any affiliates of such a Creator or any persons introduced, directly or indirectly, by such a Creator or affiliates of such Creator, in each case if the initial Lead or Creator introduction (as applicable) was accepted by the Company under the process set out below in this section 5. |

6

DocuSign Envelope ID: D333A9E2-B2CF-4C83-8GC1-9D80B3BEC370

TAP shall introduce or otherwise provide the Company with Leads and by advising the Company (i) in writing (which may be by electronic mail) or (ii) other written communication of the identity of each prospective Lead to be introduced and/or provided to the Company.  The Company acknowledges and agrees that Exhibit A and any reference to Exhibit A in this Agreement, while not a final and complete list of all Leads at the time of signing of this Agreement, contains partial initial list of the Leads and Affiliate Lead Generators submitted by TAP and TWG to the Company, and shall be periodically updated by the Parties in writing (which may be by electronic mail or other communication) from time to time, to enable TAP or TWG to submit additional approved Leads and Affiliate Lead Generators; provided, that the Parties agree that they shall not have any obligation to update the Exhibit A in order for any Lead to be deemed approved pursuant to the approval process set forth in this Section 5.

The Company hereby approves all of the Leads, Creators and Affiliate Lead Generators listed on Exhibit A. For future Leads, Creators and Affiliate Lead Generators, in each case within five (5) business days following TAP's submission of a proposed Lead, Creator and/or Affiliate Lead Generator, Company shall review the proposed Lead, Creator and/or Affiliate Lead Generator and provide TAP (which may be by electronic mail) with a notification of its acceptance of the proposed Lead, Creator and/or Affiliate Lead Generator as commissionable (meaning subsequent Deals or Relevant Cryptographs from such Lead, Creator or Affiliate Lead Generator would be considered as qualifying under this Agreement), or its rejection of the proposed Lead, Creator and/or Affiliate Lead Generator based on Company's actual material prior relationship with that proposed Lead, Creator and/or Affiliate Lead Generator.  In event that Company fails to notify TAP in writing (which may be by electronic mail) within such five (5) business day period that the proposed Lead, Creator and/or Affiliate Lead Generator was already introduced to the Company through another intermediary outside of Bryan, Alastra and/or Affiliate Lead Generator, such proposed Lead, Creator and/or Affiliate Lead Generator will then be automatically considered as qualifying under this Agreement; provided, that the Parties agree that any negotiation attempts by the Company shall be deemed as acceptance of such proposed Lead, Creator and/or Affiliate Lead Generator; provided, further, however, that as part of the evaluation of such potential Lead, Creator or Affiliate Lead Generator, the Company shall be permitted to reasonably ask TWG and TAP initial basic questions regarding the nature of the party/person, proposed Deal and TWG's and TAP's expected compensation (in the event of potential Other Deal Revenues) without such proposed Lead, Creator and/or Affiliate Lead Generator automatically being deemed accepted by the Company.

The Company further agrees that for purposes of the Company's acceptance of any proposed Lead, Creator and/or Affiliate Lead

UKMATTERS:56614075.2

| | Generator as being commissionable to TAP and TWG, such proposed Lead, Creator and/or Affiliate Lead Generator shall be deemed commissionable to TAP and TWG if TAP or TWG can reasonably demonstrate through any evidence whatsoever that the Company or any of its management or directors approved such proposed Lead, Creator and/or Affiliate Lead Generator outside of the process set forth herein. The Company further agrees to act in good faith in determining whether any proposed Lead, Creator and/or Affiliate Lead Generator was already known through a material prior relationship with the Company and/or previously introduced to the Company through another intermediary outside of Bryan, Alastra and/or their respective Leads and other Affiliate Lead Generators. |
|---|---|
| **6. Finder's Fee** | If an Investor Lead accepted by the Company under this section 6 provides the Company Group any debt or equity financing whatsoever, and/or acquires all or any of the stock and/or a material part of the assets of any Company Group member (collectively referred to herein as a "Sale Transaction" or a "Financing"), then the Company Group shall, jointly and severally, be required to pay a fee to TAP or its designee(s) (collectively, the "Finder") as provided for herein, but only if the Company did not notify the Finder within five (5) business days of receipt of any written communication (email shall suffice) or a written request to update Exhibit A by Finder to the Company about the prospective Investor Lead that such prospective Investor Lead was known to the Company under an existing material relationship or was previously introduced to the Company through another intermediary outside of Bryan, Alastra and/or their affiliates or Leads and/or Affiliate Lead Generators, and the Company had discussed or reviewed a possible Sale Transaction involving the Investor Lead, including through any other advisor or finder of the Company (other than Bryan, Alastra and/or their affiliates or Leads and/or Affiliate Lead Generators) or other Company Group member. As of the Effective Date, all Investor Leads introduced to and accepted by the Company Group by Finder are listed on Exhibit A attached hereto, which Exhibit A shall be updated by the Parties from time to time by electronic email or other written communication, to enable TAP or TWG to submit additional approved Investor Leads; provided, that the Parties agree that they shall not have any obligation to update the Exhibit A in order for any Investor Lead to be deemed approved pursuant to the approval process set forth in this Section 6.

Upon the introduction of any new Investor Lead to the Company, the Company may notify the Finder within five (5) business days in the event the proposed Investor Lead is known to the Company under an existing material relationship or has previously been introduced by a party other than Bryan, Alastra and/or their affiliates or Leads and/or Affiliate Lead Generators (in all such cases the relevant person shall not be deemed to be an Investor Lead).  In event that Company fails to notify TAP in writing (which may be by electronic mail) within such five |

8

(5) business day period that the proposed Investor Lead was already introduced to the Company through another intermediary outside of Bryan, Alastra and/or their affiliates or Leads and/or Affiliate Lead Generators, such proposed Investor Lead will then be automatically considered as qualifying under this Agreement; provided, that the Parties agree that any negotiation attempts by the Company shall be deemed as acceptance of such proposed Investor Lead.

The Company further agrees that for purposes of the Company's acceptance of any proposed Investor Lead in order for TAP and TWG to receive their Finder's Fee (as defined below), such Investor Lead shall be deemed approved by the Company if TAP or TWG can in good faith reasonably demonstrate through any evidence whatsoever that the Company or any of its management or directors approved such Investor Lead outside of the process set forth herein.  The Company agrees to act in good faith in determining whether any proposed Investor Lead was already introduced to the Company Group by a party other than by Bryan, Alastra and/or their affiliates or Leads and/or Affiliate Lead Generators.

The fee payable to TAP (the "Finder's Fee") shall be 2% of the relevant gross amount of the Financing or the gross Purchase Price Consideration for any Sale Transaction (including any assumption of debt) completed by any Investor Lead introduced, directly or indirectly, by the Finder, Bryan and/or their affiliates or Leads and/or Affiliate Lead Generators to the Company Group and accepted under the process above. For the avoidance of doubt, the Finder's Fee shall be paid to each of TAP and TWG (2% each). The Finder's Fee shall be paid in full at the time of the closing of the Financing or the Sale Transaction; provided that in the event that a Sale Transaction includes deferred consideration or consideration which is to be paid in multiple installments or in multiple forms of payment, the Finder's Fee shall be paid to Finder at the same time(s) and in the same form and substance as payment is made to the Company Group and/or its shareholders, other equity capital holders, members or debtholders in each case. "Purchase Price Consideration" is defined as the total aggregate consideration received by the Company Group, or its shareholders, other equity capital holders, members or debtholders, from any Financing or Sale Transaction, including (a) cash, (b) the value of any equity or stock consideration, (c) the value of debt consideration (including, without limitation, the amount of established line of credit or similar financing), or (d) any earn-out or other deferred payments (if applicable) (collectively, "Deferred Payments"), plus (e) the assumption of any debt of the Company Group. The Finder will make initial introductions between the Company Group and its  Representatives and any Investor Lead. The Company recognizes that Finder makes no representations regarding the accuracy or completeness of the information provided by the Company Group or with respect to any Investor. After the initial introduction by the Finder as accepted under

9

DocuSign Envelope ID: D333A9E2-B2CF-4C61-8CC1-9D80B3B5C370

the above process, the Company Group shall work directly with any Investor without involving the Finder (unless the Finder requests to be continuously involved in such discussions and this is acceptable to the potential Investor), but the Company Group shall still be fully liable for the Finder's Fee as set forth above. The Company Group shall keep the Finder fully and timely informed on the status of any Financing or Sale Transaction during any negotiations subject to any obligations of confidence it owes, provided, that such obligations of confidence shall not in any way excuse the Company from its requirement to fully and timely inform the Finder on the actual status, amount and completion date of any Financing or Sale Transaction. Under no circumstances shall Finder be deemed an agent or representative of the Company, and Finder is not authorized to bind the Company Group to any agreement or to make any representation or warranty to Investor on behalf of the Company Group.

Finder represents and warrants that Finder is not a "broker" or "dealer" within the meaning of Section 3(a)(4) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), and is not required, nor by entering into this Agreement or performing hereunder shall be required, to register as a broker or dealer under Section 15 of the 1934 Act or register as a Finder in the State of California.  In particular, Finder represents and warrants that it does not engage in the business of securing investment capital for any corporate entities, funds or persons, and will limit its finder activities pursuant to this Section 6 to introducing potential investors to Company for the purpose of consummating a Sales Transaction or Financing.  It is also understood and agreed by the parties that in no event will Finder participate in discussions or negotiations of any terms between the Company Group and Investor, assist in structuring the Sales Transaction or Financing, engage in "pre-screening" the Investor Leads to determine their eligibility to consummate a Sales Transaction or Financing, advise Investor on the value of the Company Group's securities, recommend to any Investor to invest in the Company Group's securities, or make a determination if any Investor Leads are "accredited investors" as defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"). For the avoidance of doubt, neither TAP nor any of its affiliates are broker dealers and the duties and responsibilities of TAP shall not include (i) giving tax, legal, regulatory, or other specialist or technical advice or services to the Company; (ii) giving general financial advice to the Company or negotiating agreements for the Company; or (iii) responsibility for any blockchain industry-related advice provided to the Company. The Company acknowledges that neither TAP nor any of its affiliates is a consultant or an expert in the blockchain industry. Any valuation advice which TAP or any of its affiliates provide to the Company will be given based solely on the accounting and other data and commercial assumptions provided to TAP by the Company. Notwithstanding anything to the contrary in the foregoing, TAP may associate itself at

10

DocuSign Envelope ID: D333A9E2-B2CF-4C61-8CC4-9D80B3B5C370

| | |
|---|---|
| | any time with a members of the Financial Industry Regulatory Authority ("FINRA") and/or their agents and assign some or all of its rights in this Section 6 (including, without limitation, to the Finder's Fee) to such FINRA members and/or agents who will share in TAP's compensation and/or such rights hereunder. |
| | "Investor Lead" means any potential investor introduced, directly or indirectly, by (i) Alastra, Bryan and/or their Leads or other Affiliate Lead Generators, in each case if the initial Investor Lead, Lead, Creator or Affiliate Generator Lead (as applicable) was accepted by the Company under the process set out in Sections 5 or 6, (ii) persons set forth on Exhibit A and their affiliates and/or (iii) any other persons introduced, directly or indirectly, by such persons set forth on Exhibit A or their affiliates (if such person(s) was accepted by the Company under the process set out in Sections 5 or 6. |
| **7. Definition of Company Platform; Initial Public Launch Date** | The "Company Platform" shall have the combined meaning as described in this Section 7. |
| | The Company Platform shall include any and all commercial and/or philanthropic blockchain-based technologies, technologies that operate outside of the blockchain, and other technologies and platforms, owned, licensed, acquired, invented, developed and/or controlled by the Company or any other member of the Company Group and all rights and interest therein and their successors or assigns, including, without limitation, the technology covered by the Patents filed under patent numbers as set forth on <u>Exhibit C</u> attached hereto.  As an example, the current version of the Company Platform, among other things, records the provenance and ownership of and allows trading in original digital collectibles designed by well-known persons, the transfer and monetization of which, creates revenues which are shared between such creators and their nominated charities and the Company. Such technology shall include any and all other related blockchain platforms and derivatives thereof that are invented or created by the Company or any of its founders, subsidiaries, employees, officers, affiliates, successors and assigns (collectively, the "Representatives") and any other party that the Company or any of its Representatives engages for such purpose, at any time before and after the date of this agreement. |
| | Notwithstanding the foregoing, any reference to the Company's business, platform or technology in this Agreement shall also include any lines of business, operations, platforms or technology that any member of the Company Group is engaged in as of the Effective Date or may be engaged in in the future that is related to, or derived from, directly or indirectly, the Company Platform. |
| | The target date for the first auction shall be on or about April 30, 2020, or such later date as the Company determines based on necessary business exigencies. |
| **8. Non-Circumvention** | Company or any of the other members of the Company Group or any |

UKMATTERS:56614075.2

|  | companies or persons affiliated with or employed by any Company Group member or any of its Representatives (collectively, the "Company Entities") shall not circumvent Alastra or Bryan, or cause any other person to circumvent Alastra or Bryan in any way in connection with this Agreement or any of their rights hereunder, including, without limitation, as to any of Alastra's or Bryan's Leads, Investor Leads or any of the other Affiliate Lead Generators, for purposes of soliciting business or financing from, or transacting business with, such contact. The Company agrees that it must obtain the prior written permission (email to suffice) of TAP or TWG, as applicable, before engaging in any discussions with any of Alastra's or Bryan's Leads or other Affiliate Lead Generators (for the avoidance of doubt save where they are already known to Company as of the date hereof or introduced by persons other than TAP, TWG and/or their affiliates or Leads).  The parties acknowledge that breach of this Section 8 shall constitute a material breach of the Agreement. |
|---|---|
|  | If at any time during the period of five years from the Effective Date, any Company Group member consummates a Deal with any proposed Lead, Creator and/or Affiliate Lead Generator that was previously rejected by the Company (other than because such proposed Lead, Creator and/or Affiliate Lead Generator was already introduced to the Company through another intermediary outside of Bryan, Alastra and/or their affiliates or Leads and/or Affiliate Lead Generators), the fees as provided in Sections 3 and 4 shall be payable to TWG and TAP. |
|  | If at any time during the period of five years from the Effective Date, any Company Group member consummates a Sale Transaction or a Financing with any proposed Investor Lead that was previously rejected by the Company (other than because such proposed Investor Lead was already introduced to the Company through another intermediary outside of Bryan, Alastra and/or their affiliates or Leads and/or Affiliate Lead Generators), the Finder's Fee as provided in Section 6 shall be payable to TWG and TAP. |
| **9. Approval Rights and Credit** | TAP shall have the right in perpetuity to approve in advance in writing (email to suffice) all correspondence and materials to Alastra's or TAP's Leads (for the avoidance of doubt save where they are already known to Company as of the date hereof or introduced by persons other than TAP, TWG and/or their affiliates or Leads), including, without limitation, any usage of any such Leads' name or likeness in connection with the advertising, publicity, display or any other use by or related to the business of the Company Group.  Additionally, the Company shall (i) accord TAP the right to (x) be credited on all Company Group business materials, promotions and advertising related to Alastra or Alastra's Leads and (y) determine in what capacity and how such credit shall appear, acting reasonably, and (ii) obtain TAP's prior written approval (email to suffice) of any advertising, publicity or display which contains any mention or reference to Alastra or Alastra's Leads, such approval |

| | not to be unreasonably withheld. |
|---|---|
| **10. Board Observer Rights** | Alastra shall be entitled, for such time as TAP holds any Warrants or shares in the capital of the Company to (i) designate (but not an obligation to do so) a director to be appointed to the Board, provided, that such designee (if other than Mr. Alastra and Mr. Bryan) shall be approved by the Company, with such approval not to be unreasonably withheld, conditioned or delayed, or (ii) observe on a non-voting basis, or appoint one non-voting observer to observe (collectively, an "Observer"), and attend each meeting of the Board, provided, that such Observer (if other than Mr. Alastra and Mr. Bryan) shall be approved by the Company in advance (email to suffice), with such approval not to be unreasonably withheld, conditioned or delayed. Subject to the Company's approval as provided in this Section 10, an Observer may be appointed or removed by TAP by service of notice in writing to [the registered office of the Company]/[email address].The Observer shall be sent prior notice of the time and place of each meeting of the Board or any material subsidiary of the Company or any audit, compensation or executive committee thereof in the same manner and at the same time as notice is sent to members of the relevant Board and/or any such committees thereof and shall be sent copies of all notices, reports, minutes, consents and other documents (including all monthly, quarterly and annual financial statements) at the time and in the manner as they are provided to the other members of the relevant Board and/or any audit, compensation or executive committees thereof. The Observer shall be entitled to attend and speak at any such meetings of the Board and/or any such committees thereof telephonically with reasonable access to live electronic presentation of the same but shall not be entitled to vote on any matters. Notwithstanding the foregoing, the Observer may be excluded from any meeting (or portion thereof) of the Board and/or any audit, compensation or executive committees thereof and materials provided to the participants in such meetings may be withheld from the Observer or redacted before being provided to the Observer if: (a) the reason for such exclusion, withholding or redaction is primarily (i) to preserve an attorney-client privilege available to the Company that would be lost absent such exclusion, withholding or redaction, or (ii) that the Observer is, or is reasonably thought to have links to, a competitor of the Company, in each case as is reasonably determined in good faith by the Board or committee thereof. The Observer agrees to hold in confidence and trust with respect to all information provided to it pursuant to its rights under this Agreement or in its capacity as an Observer. |
| **11. Amendments; Entire Agreement** | This Agreement shall not be amended or modified except by written instrument signed by both parties. This Agreement contains all the provisions, conditions, understandings, and agreements between the parties hereto with respect to the subject matter hereof and supersedes all other oral or written agreements between the parties |

13

DocuSign Envelope ID: D333A9E2-B2CF-4C61-8CC4-9D80B3B5C370

| | hereto. |
|---|---|
| **12. Reporting Obligations** | The Company shall, and shall cause the Company Group to, in perpetuity keep and make available for TAPs "view-only" electronic review standard and customary financial and business records of the Company, including, without limitation, accounting ledgers, banking statements, profit and loss statements and other accounting records, and detailed records of all receipts, revenues and disbursements, and other financial activities with respect to the business of the Company Group and the internal affairs and corporate governance (including, without limitation, minutes of all Board and committee meetings thereof) of the Company Group which the Company group maintains in the ordinary course of business (collectively, "Records"), which Records shall at all times at a minimum show truthfully, accurately and fully the compliance by each party with its respective obligations under this Agreement. |
| | In addition, on or about the 30th day following the end of each calendar quarter, Company shall furnish to TAP a report of all significant transactions occurring during such prior quarter, including, without limitation all financial Records and summaries of Company's business dealings and transactions. Within a reasonable time after (i) the close of a calendar year and (ii) the expiration or termination of this Agreement, TAP shall have the right, through its designated representatives, at all reasonable times, upon reasonable advance notice, to inspect the Company Group's Records (or electronically if requested by TAP) as necessary to verify the sales, revenues generated and fees collected pursuant to this Agreement, as well as for any other business purposes. The Company Group shall retain all Records at all times, whether before or after the term of this Agreement, and shall make the Records available to TAP during regular business hours, wherever the Records are maintained (or electronically if requested by TAP).  If any inspection or audit shows that the Company has underpaid TAP or TWG by more than 5% of the amount payable to TAP or TWG during the period inspected, then the Company will promptly send payment in readily available funds to TAP or TWG (as applicable) in the amount of the unpaid balance, plus interest in the amount of 3.5% on the unpaid balance.  The Company shall also provide TAP on a quarterly basis with a complete and accurate breakdown of all equity exchanged, sold or purchased, in-kind income, or any investment proceeds secured by TAP Leads, TWG Leads or any of their Affiliate Lead Generators. |
| | The unaudited accounts of the Company in respect of each accounting period shall be completed and approved by the Board and delivered to TAP within two months after the end of the accounting period to which such unaudited accounts relate. |
| | The Company shall provide TAP promptly with such other information concerning the Company and its business as TAP may reasonably require from time to time. |

14

| 13. Governing Law | This Agreement shall be deemed to be made in, and in all respects, shall be interpreted, construed, and governed by and in accordance with, the laws of the State of California, without giving effect to principles of conflicts of law. Each of the parties to this Agreement consents to the exclusive jurisdiction and venue of the courts of the state and federal courts of Los Angeles County, California. |
|---|---|
| | The Warrants shall also be granted pursuant to a warrant instrument that is governed by the laws of the State of California, and any and all disputes, claims, or causes of action, in law or equity, including but not limited to statutory claims, arising from or relating to the enforcement, breach, performance, or interpretation of the Warrants, shall be resolved, to the fullest extent permitted by law, as provided in this Section 13. |
| | If any dispute, claim, or cause of action, in law or equity, including but not limited to statutory claims, arising from or relating to the enforcement, breach, performance, or interpretation of this Agreement or the Warrants, is brought against any Party, the prevailing Party shall be entitled to recover reasonable attorneys' fees, costs, expenses and disbursements, in addition to any other relief to which the prevailing Party may be entitled. |
| 14. Indemnification | The Company Group and any successor entities, jointly and not severally, hereby agree to fully indemnify, hold harmless and defend Alastra and their affiliates and their respective employees, officers, directors, shareholders, members, attorneys, advisors, agents and representatives (collectively, the "TAP Representatives") from and against any and all liability, loss, claim, damage, obligation, judgement, cost or expense (including reasonable attorneys' fees and expenses) (collectively, the "Damages"), whether arising before or after the Effective Date, incurred on account of or arising out of (i) any willful, intentional, grossly negligent or negligent act on the part of any member of the Company Group or any of their Representatives in connection with any member of the Company Group's performance under this Agreement or any Financing or Sale Transaction, (ii) any breach of or inaccuracy in any member of the Company Group's representations, warranties, obligations, covenants or agreements contained herein, (iii) any action, suit or proceeding brought by a third party based on a claim that any member of the Company Group's representations, warranties, agreements, covenants or obligations contained herein were inaccurate or misleading or otherwise cause for such third party's obtaining any damages or redress from Alastra, or (iv) any member of the Company Group's use, monetization and/or exploitation of the intellectual property of any member of the Company Group or any third party, including, without limitation, an allegation that such use, monetization and/or exploitation infringes the rights of any third party.  Furthermore, the Company Group and any successor entities, jointly and not severally, hereby agree to fully indemnify, hold harmless and defend Alastra and other TAP Representatives from and |

UKMATTERS:56614075.2

DocuSign Envelope ID: D333A9E2-B3CF-4C61-8CC4-9D80B3B5C370

| | |
|---|---|
| | against any and all Damages arising out of or in connection with any communications, documents, materials or other information furnished to TAP by any Company Group member or any of its Representatives for use, communication or dissemination in connection with this Agreement, and Alastra may rely upon the accuracy thereof without independent investigation. |
| | The Company further agrees that to the extent any Company Group agreement, contract or arrangement relates to Bryan and/or Alastra, the Company shall use its best efforts to have the counterparty to such agreement, contract or arrangement represent that such party in entering into such agreement, contract or arrangement is in no way relying on any warranties, representations or statements or otherwise made by Bryan, Alastra and/or their affiliates. |
| **15. Fee and Expense Reimbursement** | The Company shall reimburse TAP for all of its reasonably incurred legal and other professional fees relating to the drafting and negotiation of this Agreement, anticipated to be approximately $10,000. In addition, Company shall reimburse TAP for all reasonable preapproved (in writing) travel, entertainment, administrative and other expenses incurred or paid by TAP in connection with the performance of this Agreement, including without limitation, the procurement of revenues, business arrangements, new Creators and their associated Cryptographs (including costs incurred by an Affiliate Lead Generator in performing said tasks), the onboarding of new Affiliate Lead Generators, managing a relationship with a Lead or Affiliate Lead Generator, marketing costs for Company-approved marketing campaigns and other similar business-focused activities. |
| **16. Board Approval** | The Company has the corporate power and authority and has taken all corporate action necessary to authorize the signing, delivery and performance of this Agreement and all of the transactions and obligations contemplated herein. |
| **17. Organization; Good Standing** | The Company is a corporation duly organized, validly existing and in good standing under the laws of the United Kingdom with all requisite corporate power and authority to carry on its business as contemplated in this Agreement.  The Company is duly qualified to do business in each jurisdiction where the conduct of its business requires such qualification. |
| **18. Patents, Trademarks, Licenses, etc.** | Company warrants and represents to TAP that it owns or possesses the right to use all the trademarks, service marks, brands, copyrights, patent applications and licenses, and rights with respect to the foregoing, necessary for the continued conduct of its Platform business for the purposes as generally described in the Company's pitch deck or herein, without any known material conflict with the rights of others, and Company is not otherwise aware of any claimed conflict with respect to the foregoing.  The Company has all material licenses, permits and other authorizations necessary for the conduct of its |

16

|  | Platform business as represented to TAP. |
|---|---|
| **19. Entire Agreement** | The Parties expressly acknowledge and agree that this Agreement and the Warrants shall constitute as of the Effective Date a binding agreement between them, and the Parties by entering into this Agreement fully intend to be legally bound by its terms. This Agreement supersedes all prior agreements and understandings between the Parties with respect to the subject matter hereof. |
| **20. Further Assurances** | The Company shall do and perform, or cause to be done and performed (including, without limitation, the other Company Group members and their Representatives to perform), all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents (including without limitation all Company-issued stock purchase agreements and stock option or warrant purchase agreements) as reasonably required in order to carry out the intent and accomplish the purposes of this Agreement and consummation of the transactions contemplated hereby or as may be reasonably requested by TAP and/or TWG. |
| **21. Spin-Offs or Split-Offs** | Subject to Section 22, in the event that a Party effects the separation of a substantial portion of its business into one or more entities that is not a wholly owned subsidiary of the Company (each, a "NewCO"), whether existing or newly formed, including without limitation by way of spin-off, split-off, reorganization or similar transaction, prior to such separation, the party shall cause any such NewCo to enter into an agreement with the other party that contains rights and obligations of the parties that are substantially identical to those set forth in this Agreement. This paragraph shall not apply to the sale of any portion of the Company's business or of a subsidiary of the Company in good faith for fair market value to an unrelated non-affiliated third party. |
| **22. Binding Agreement and Successors** | No Party may assign or delegate this Agreement without the prior written consent of the other, except that the Company may assign or delegate this Agreement to any successor (whether direct or indirect, whether by purchase, merger, consolidation, operation of law, or otherwise) to all or substantially all of the business or assets of the Company, subject to the condition that the successor, no later than fifteen (15) days before the occurrence of such succession, executes and delivers to TAP an instrument in form and substance acceptable to TAP (such approval not to be unreasonably withheld) pursuant to which the successor shall explicitly assume and agree to perform, comply with, and otherwise be bound by this Agreement in the same manner and to the same extent that the Company would be required to do so if no such succession had occurred.  Alastra may, with the prior consent of the Company, assign this Agreement and/or any of its rights and/or obligations under this Agreement (including, without limitation, TAP's Shares, Warrants and Revenue Shares) to any of Alastra's permitted transferees pursuant to the articles of association of the Company.

In the event of Tommy Alastra's death, all of Alastra's equity in the |

17

| | Company, Revenue Share and other rights and/or obligations under this Agreement owned by Alastra as of such date shall be transferred immediately to Mr. Alastra's designated beneficiary, or, in the absence of such designation, to Mr. Alastra's estate. The Company shall also be obligated to pay to Mr. Alastra's designated beneficiary or estate (as the case may be), any other compensation, amounts or benefits then payable by the Company to Alastra from and after the date of Mr. Alastra's death.<br><br>Subject to the immediately preceding sentences, this Agreement shall bind and inure to the benefit of the Parties and their permitted successors, assigns, heirs and beneficiaries.  As used in this Section 22, the term "Company" means the Company Group as hereinbefore defined and any successor to its business or assets as aforesaid that assumes and agrees to perform this Agreement, whether by operation of law or otherwise. |
|---|---|
| **23. Termination** | This Agreement may not be terminated by either Party for any reason without the other Party's prior written consent. |
| **24. Status** | Neither this Agreement, nor any transaction under or relating to this Agreement, shall be deemed to create an agency, partnership or joint venture relationship between the Parties or any of their affiliates. Alastra shall not be an employee of any member of the Company Group. Alastra is and shall be an independent contractor. Alastra shall have neither the power nor the authority to negotiate and/or execute agreements on behalf of the Company Group, and Alastra shall not be authorized to bind the Company Group in any way whatsoever. |
| **25. Survival** | Sections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 20, 21, 22, 25 and 26 of this Agreement shall survive any termination or expiration of this Agreement. |
| **26. Severability** | In the event that any of the provisions of this Agreement are held to be unenforceable or invalid by any court of competent jurisdiction, the validity and enforceability of the remaining provisions shall not be affected thereby. |
| **27. Counterparts** | This Agreement may be executed in two or more counterparts, by electronic transmission (including DocuSign and PDF) or otherwise, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument. |

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties have entered into and signed this Agreement as of the date and year first above written.

**PERPETUAL ALTRUISM LTD.,**
a limited company incorporated in the United Kingdom (reg. no. 11219425)

By: _____

Name: Hugo McDonaugh
Title: Chief Executive Officer

Dated: April 6th, 2020

**TOMMY ALASTRA PRODUCTIONS INC.**

By: _____

Name:  Tommy Alastra
Title: Chief Executive Officer

Dated: April 6th, 2020

19

**EXHIBIT A**

LIST OF CREATORS AND LEAD GENERATION AFFILIATES

[TAP & TWG to provide]

**EXHIBIT B**

LIST OF 12 EXISTING CRYPTOGRAPHS

1.  Vitalik Buterin

2.  Roger Ver

3.  Vlad Zamfir

4.  Ryan Selkis

5.  Jeremy Gardner

6.  Alex Van de Sande

7.  Jake Brukhman

8.  Evan Van Ness

9.  Vinay Gupta

10. Mihai Alisie

11. Rune Christensen

12. Emin Gun Sirer

UKMATTERS:56614075.2

**EXHIBIT C**

PATENT AND PATENT APPLICATION NUMBERS

W0 2020/030891 A1