# EXHIBIT 2

DocuSign Envelope ID: B8FC5049-7C62-4BB0-AE1B-2DA0F4001550

## Memorandum of Understanding

This Memorandum of Understanding (this "MOU"), dated as of June 8, 2021 (the "Effective Date") - which (apart from the Binding Terms hereunder) is subject to contract and is not intended to be legally binding upon the parties - outlines certain key terms upon which a long form agreement shall be negotiated in good faith between, Perpetual Altruism Ltd. ("PA") and Tommy Alastra Productions Inc. (together with Tommy Alastra, "TAP").

The parties acknowledge that this MOU does not place either of them under an obligation to conclude an agreement to revise the Prior Agreement (as defined below), and no such obligation will arise unless and until a legally binding amendment to each of the Prior Agreements (collectively, the "Amendments") are agreed and executed by the parties.

**WHEREAS,** PA has entered into the (i) Equity, Compensation and Revenue Sharing Agreement, dated as of April 6, 2020 (the "TAP Agreement"), with TAP and (ii) the Equity, Compensation and Revenue Sharing Agreement, dated as of April 6, 2020. The parties are contemplating to revise the terms of the Prior Agreements.

TAP producing cryptographs is not conditional on Tommy's employment at MyNFT (cryptographs and MyNFT are tied together), which shall be negotiated by the parties in good faith with Tommy to be paid starting on June 1, 2021.

1. For every Cryptograph deal from this point forward whether brought by TAP or not, TAP is entitled to 50% of PA/ Cryptograph gross revenue share from every deal in perpetuity.
    a. This is PA's and TAP's new partnership arrangement moving forward as PA is now outsourcing the majority of Cryptograph production, content sourcing, affiliate management, marketing and sales to TAP.
    b. TAP agrees to pay 1.25% net of any TAP produced Cryptographs to John via PA payout to WG.
    c. No time limitation for receiving revenue share on all cryptographs (whether TAP produces or not), whether produced before, in the future or secondary resales, specific to cryptographs only.
    d. PA is responsible for the costs and expenses of the production of the cryptographs.
        i. No expenses or other deductions from PA's gross revenues before split between TAP and PA. Any amount of $ spent to produce the Cryptographs does not get taken off the top and shall be paid by PA/Cryptographs. This includes production funds, advances, guarantees, charitable donations, etc.)
    e. For all previous Cryptographs that originated through TAP and have already been sold, going forward the revenues made on the secondary market from those Cryptographs are also split 50%/50% gross between PA and TAP.

2. Cryptographs will outsource to TAP to oversee production, sales and marketing of cryptographs, and provide no less than a $500k budget to TAP (the "Initial Budget"), inclusive of all fees, and which budget must be fully funded to TAP in order for TAP to

continue /proceed.
  a. If PA and Tommy don't agree on the terms of Tommy's employment with MyNFT or TAP elects not to produce the cryptographs as contemplated herein, then the remainder of the Initial Budget minus costs incurred by TAP to date comes back to PA.

3. TAP agrees to produce for PA's Cryptograph and shall be the lead producer for such cryptographs. This stipulation comes from the exposure TAP will endure to continue to build and sustain the Cryptograph brand at a highly discounted amount. Should PA wish to continue to produce Cryptographs, PA will need to procure and provide TAP with additional budget to sustain the company and brand post Dec. 2021. Additional funds will be required by Dec. 1, 2021 in order to retain TAP resources and TAP's team.
  a. TAP has been working hard to secure cryptographs with various artists and has already entered into legally binding contracts with two artists to produce cryptographs with US$30k committed to such negotiated deals and cover expenses.
  b. TAP shall continue to work in good faith that the Series A funding will close and the full budget will be provided to TAP.
  c. If Series A funding or similar doesn't close, then PA shall be responsible for US$30k of fees already committed to by TAP which will need to be in by June 15th for end of June Cryptographs release to market and promote the first gas less drop.
  d. TAP shall use commercially reasonable best efforts to achieve cryptographs results.

4. Tommy's employment with MyNFT shall be negotiated by the parties in good faith with Tommy to be paid starting effective as of June 1, 2021.
  a. Day 1 of effective employment and payment shall be June 1, 2021, with MyNFT salary to be paid (including backpay) starting on the first day of the closing of the earlier of current Series A funding round or similar round.
    i. At closing of such round, £90,000.00 shall be the compensation paid to Tommy in monthly installments of £7,500 per month at the beginning of each month with the first payment backdated on June 1,2021.
      1. Example. Round Closes July 1, 2021, then Tommy shall be paid £15,000.00 for June and July payments.
    ii. Should terms of Tommy's employment with MyNFT not be agreed upon while waiting for employment package then TAP won't be responsible to pay PA back any amounts and a good faith negotiation on the deals TAP has brought forth that need to be finalized.
    iii. Hugo to provide your thoughts on what a comp package for Tommy at MyNFT would entail.
    iv. Tommy shall be employed as part of the Business Development and Partnerships team at MyNFT.
    v. Tommy's employment agreement with MyNFT will come with a customary salary and performance targets
    vi. Hugo to please provide accounting update and plan for budget for PA

    vii. Tommy's salary, including backpay, to be paid in accordance with PA's standard payroll policies.
  b. Tommy to receive an annual salary from MyNFT
    i. Hugo to please provide thoughts on how Tommy's salary and other comp shall be adjusted upward in the future if MyNFT achieves projected results.
    ii. Parties to discuss within 6 months based on PA's performance to reevaluate in good faith
  c. No reimbursement if Tommy leaves at any point.

4. For all previous Cryptographs that originated through Tommy and have already been sold, going forward the revenues made on the secondary market from those Cryptographs are also split 50%/50% gross between PA and TAP.
  a. No time limit on rev share.

5. PA and MyNFT shall secure standard D&O and general liability insurance and enter into indemnification agreement with Tommy if employed.

6. The 'Other Deals Clause' in TAP's Prior Agreement with PA shall not be affected until Tommy's employment terms are finalized as an executive employee of MyNFT. This clause shall spring back into effect in the event of Tommy's departure from MyNFT for any reason or not reason.

7. Non-circumvention of any of TAP's terms or involvement with PA, Cryptographs, any of their subsidiaries, etc.

## Binding Terms

*Confidentiality*

The parties agree to keep confidential and not (directly or indirectly) disclose, report, publish or otherwise disclose this MOU, its terms or existence, any discussions or negotiations in connection with this MOU and any information shared between the parties in the course of their discussions, whatever the nature of such information, save to the extent that such disclosure is required by law or applicable regulation, or made with the prior written consent of the other party.

**Agreement Discussions**

The parties shall discuss and work in good faith to enter into binding Amendments within 30 days from the Effective Date

**Governing Law and Jurisdiction**

This MOU and any dispute or claims arising in relation to it or its subject matter shall be governed by and construed in accordance with the laws of the State of California and the

DocuSign Envelope ID: B8FC5049-7C62-4BB0-AE1B-2DA0F4001550

7. Non-circumvention of any of TAP's terms or involvement with PA, Cryptographs, any of their subsidiaries, etc.

## Binding Terms

*Confidentiality*

The parties agree to keep confidential and not (directly or indirectly) disclose, report, publish or otherwise disclose this MOU, its terms or existence, any discussions or negotiations in connection with this MOU and any information shared between the parties in the course of their discussions, whatever the nature of such information, save to the extent that such disclosure is required by law or applicable regulation, or made with the prior written consent of the other party.

*Agreement Discussions*

The parties shall discuss and work in good faith to enter into binding Amendments within 30 days from the Effective Date

**Governing Law and Jurisdiction**

This MOU and any dispute or claims arising in relation to it or its subject matter shall be governed by and construed in accordance with the laws of the State of California and the parties agree to the exclusive jurisdiction of any state or federal courts located in the City of Los Angeles, CA. This section shall survive any termination or expiration of this MOU.

**PERPETUAL ALTRUISM LTD.,**
a limited company incorporated in the United Kingdom (reg. no. 11219425)

By: _/s/ Hugo McDonaugh_
Name: Hugo McDonaugh
Title: Chief Executive Officer

Dated: June 8, 2021

**TOMMY ALASTRA PRODUCTIONS INC.**

By: _/s/ Tommy Alastra_
Name: Tommy Alastra
Title: Chief Executive Officer

Dated: June 8, 2021